MALCOLM A. HEINICKE (State Bar No. 194174)
malcolm.heinicke@mto.com
MARJA-LIISA OVERBECK (State Bar No. 261707)
mari.overbeck@mto.com
JEFFREY M. OSOFSKY (State Bar No. 268593)
jeff.osofsky@mto.com
MUNGER, TOLLES & OLSON LLP
560 Mission Street
Twenty-Seventh Floor
San Francisco, California 94105-2907
Telephone:      (415) 512-4000
Facsimile:      (415) 512-4077


TERRY E. SANCHEZ (State Bar No. 101318)
terry.sanchez@mto.com
MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue
Thirty-Fifth Floor
Los Angeles, California 90071-1560
Telephone:      (213) 683-9100
Facsimile:      (213) 687-3702

Attorneys for Defendant
WELLS FARGO ADVISORS, LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| VLAD TSYN, DANIEL SILBERMANN, LORI BAGWELL, and CATHERINE HORAN WALKER, individually and on behalf of all others similarly situated,<br><br>           Plaintiffs,<br><br>      vs.<br><br>WELLS FARGO ADVISORS, LLC,<br><br>           Defendant. | Case No. 14-cv-02552-LB<br><br>**DEFENDANT WELLS FARGO ADVISORS, LLC'S NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Date:      January 28, 2016<br>Time:      9:30 a.m.<br>Courtroom: C –15th Floor<br>Judge:    Hon. Laurel Beeler |

1    <u>**NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGEMENT**</u>

2        TO THE PARTIES AND THEIR ATTORNEYS OF RECORD:

3        **PLEASE TAKE NOTICE** that on January 28, 2016 at 9:30 A.M. or as soon thereafter as

4    the matter may be heard, in Courtroom C, 15th Floor, of the Honorable Laurel Beeler of the

5    United States District Court, Northern District of California, 450 Golden Gate Avenue, San

6    Francisco, California 94102, Defendant Wells Fargo Advisors, LLC ("Defendant" or "WFA"),

7    will and hereby does move the Court for partial summary judgment pursuant to Rule 56 of the

8    Federal Rules of Civil Procedure, dismissing Plaintiff Vlad Tsyn's individual Second Cause of

9    Action contained in the Third Amended Complaint alleging violations of 29 U.S.C. § 201 *et seq.*

10   WFA brings this motion on the grounds that there is no genuine dispute as to any material fact

11   Plaintiff Tsyn qualified for the administrative exemption during his tenure with WFA.

12   Specifically, Plaintiff's own deposition testimony confirms that his duties qualified him for the

13   exemption.

14       This motion is based on this Notice of Motion and Motion, the attached Memorandum of

15   Points and Authorities, the concurrently filed declaration of Malcolm Heinicke and the exhibits

16   thereto, the pleadings and records on file in this action, and on any additional evidence and

17   arguments that may be presented before or at the hearing of this motion.  The Court has set a

18   stipulated briefing schedule for this motion.  *See* ECF No. 52.

19

20   DATED:  November 19, 2015                 MUNGER, TOLLES & OLSON LLP

21

22

23                                            By:    /s/ *Malcolm A. Heinicke*

24                                                   MALCOLM A. HEINICKE
                                                     Attorneys for Defendant WELLS FARGO ADVISORS,
25                                                   LLC

26

27

28

# TABLE OF CONTENTS

**Page**

MEMORANDUM OF POINTS AND AUTHORITIES ............................................................. 1

I.      INTRODUCTION AND SUMMARY OF ARGUMENT ............................................ 1

II.     RELEVANT PROCEDURAL HISTORY ................................................................. 4

III.    UNDISPUTED FACTS ............................................................................................ 4

        A.      Plaintiff Worked for WFA as a Licensed, Financial Services Professional ............. 4

        B.      Plaintiff's Specific Job Duties ..................................................................... 5

                1.      Plaintiff Collected and Analyzed His Clients' Financial Information .......... 8

                2.      Plaintiff Determined Which Investments Best Suited His Clients ............... 9

                3.      Plaintiff Advised His Clients on Advantages and Disadvantages ............... 10

                4.      Plaintiff Engaged in Marketing, Servicing, and Promotional Work .......... 10

        C.      Temporal Allocation of Plaintiff's Time ....................................................... 11

        D.      Plaintiff Had Considerable Discretion and Independence in His Job ................. 11

IV.     ARGUMENT ....................................................................................................... 12

        A.      The Administrative Exemption as Applied to Financial Advisors ....................... 13

                1.      DOL Regulations Have Long Stated that FAs Satisfy the Duties Test ....... 13

                2.      The DOL Has Not Challenged Industry-Wide Classification Practice ....... 15

        B.      Plaintiff is Exempt Because His Duties Track Those in § 541.203(b) .................. 16

        C.      Plaintiff Cannot Evade The Clear Application of The Exemption ....................... 20

                1.      Plaintiff's Individual Clients Do Not Preclude His Exempt Status ........... 20

                2.      Plaintiff Exercised Discretion by Making Recommendations ................... 24

V.      CONCLUSION .................................................................................................... 25

# TABLE OF AUTHORITIES

**Page**

**FEDERAL CASES**

*In re American Family Mut. Ins. Co. Overtime Pay Litig.*,
   2007 WL 2936319 (D. Colo. Oct. 9, 2007)...........................................................17

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) .......................................................................................12

*Auer v. Robbins*,
   519 U.S. 452 (1997) ....................................................................................3, 15

*Bachrach v. Chase Inv. Servs. Corp.*,
   2007 WL 3244186 (D.N.J. Nov. 1, 2007)................................................................20

*Boykin v. Boeing Co.*,
   128 F.3d 1279 (9th Cir. 1997).............................................................................13

*Christopher v. SmithKline Beecham Corp.*,
   132 S. Ct. 2156 (2012) ...................................................................................15

*In re Farmers Ins. Exch., Claims Representatives' Overtime Pay Litig.*,
   481 F.3d 1119 (9th Cir. 2006)...................................................................... *passim*

*Hein v. PNC Fin. Servs. Group, Inc.*,
   511 F. Supp. 2d 563 (E.D. Pa. 2007) ...............................................4, 18, 19, 20

*Hogan v. Allstate Ins. Co.*,
   361 F.3d 621 (11th Cir. 2004)...............................................................................18

*Perez v. Mortg. Bankers Ass'n.*,
   -- U.S. --, 135 S. Ct. 1199 (2015).........................................................................21

*Pontius v. Delta Fin. Corp.*,
   2007 WL 1412034 (W.D. Pa. May 10, 2007) .................................................22, 23

*Pontius v. Delta Fin. Corp.*,
   2007 WL 1496692 (W.D. Pa. Mar. 20, 2007).........................................................23

*Reich v. John Alden Life Ins. Co.*,
   126 F.3d 1 (1st Cir. 1997) ...................................................................................18

*Roe-Midgett v. CC Servs., Inc.*,
   512 F.3d 865 (7th Cir. 2008)...........................................................................21, 22

*Wilshin v. Allstate Ins. Co.*,
   212 F. Supp. 2d 1360 (M.D. Ga. 2002) .................................................................18

*Yi v. Sterling Collision Ctrs., Inc.*,
    480 F.3d 505 (2007) ...........................................................................................16

**FEDERAL RULES**

Fed. R. Civ. P. 56(a) ............................................................................................12

**FEDERAL REGULATIONS**

29 C.F.R.
    § 541.200(a)(1) ................................................................................................13
    § 541.200(a)(2) ................................................................................................22
    § 541.200(a)(2), (3) ...................................................................................13, 22
    § 541.201(a)(3) ................................................................................................14
    § 541.202(a) .....................................................................................................25
    § 541.202(c) .....................................................................................................25
    § 541.203 .................................................................................................. *passim*
    § 541.203 (2007) ..............................................................................................20
    § 541.203(b) ............................................................................................. *passim*
    § 541.205(c)(5) (1949) ..........................................................................1, 13, 14
    § 541.205(c)(5) (1973) .....................................................................................14
    § 541.207(d)(2) (1949) ..........................................................................1, 14, 24
    § 541.207(d)(2) (1973) .....................................................................................14
    § 541.700(a) .....................................................................................................13
    § 541.700(b) .....................................................................................................20

69 Fed. Reg. 22,122, 22,146 ..................................................................1, 3, 14, 18

69 Fed. Reg. at 22145-46 ..........................................................................................18

69 Fed. Reg. 22193 ...................................................................................................17

70 Fed. Reg. 20,424, 20,428 ....................................................................................14

80 Fed. Reg. 38516-01, Appendix A ........................................................................23

FINRA Rule 1031 .......................................................................................................4

FINRA Rule 2020 .....................................................................................................24

FINRA Rule 2090 ..................................................................................................1, 8

FINRA Rule 2111 .............................................................................................1, 8, 9

FINRA Rule 2510(b) .................................................................................................24

NYSE Rule 408(a) ....................................................................................................24

1  **OTHER AUTHORITIES**

2  Opinion Letter Fair Labor Standards Act (FLSA),
        2005 WL 3308596 (Aug. 26, 2005) ........................................................................17
3

4  Opinion Letter Fair Labor Standards Act (FLSA),
        2006 WL 3832994 (Nov. 27, 2006) ................................................................. *passim*
5

   Opinion Letter Fair Labor Standards Act (FLSA),
6        2010 WL 1822423 (Mar. 24, 2010) ...............................................................21, 22

7  http://webapps.dol.gov/elaws/whd/flsa/overtime/jobs.htm#F...........................................23

8  http://www.dol.gov/whd/overtime/fs17m_financial.htm ...............................................24

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

2

**I.       INTRODUCTION AND SUMMARY OF ARGUMENT**

3        Plaintiff Vlad Tsyn worked as a Series 7 licensed Financial Advisor (a stock broker) with

4   Defendant Wells Fargo Advisors, LLC ("Wells Fargo" or "WFA"), where, consistent with

5   decades of regulatory guidance and industry practice, he was classified as an exempt "white

6   collar" employee under the federal Fair Labor Standards Act ("FLSA").  Because Plaintiff Tsyn

7   has admitted that he performed the very tasks that the pertinent regulations and guidance have

8   deemed exempt, WFA is entitled to summary judgment on his individual misclassification claim.

9        Since the 1940s, Department of Labor ("DOL") regulations have provided that the

10   administrative exemption covers licensed Financial Advisors ("FAs") who perform the common

11   FA advisory tasks required by securities laws.  *See* 29 C.F.R. § 541.205(c)(5) (1949); 29 C.F.R. §

12   541.207(d)(2) (1949).  In 2004, the DOL stated that "many financial services employees" satisfy

13   the exemption and issued clarifying regulations stating that such employees "generally meet the

14   duties requirements for the administrative exemption" if their tasks "include":

15           collecting and analyzing information regarding the customer's income, assets,
            investments or debts; determining which financial products best meet the
16           customer's needs and financial circumstances; advising the customer regarding
            the advantages and disadvantages of different financial products; and marketing,
17           servicing or promoting the employer's financial products.  However, an employee
            whose primary duty is selling financial products does not qualify for the
18           administrative exemption.

19   29 C.F.R. § 541.203(b); 69 Fed. Reg. 22,122, 22,146 (Apr. 23, 2004).  The DOL's decision to

20   specify these duties as exempt was telling because pertinent FINRA rules require Series 7 licensed

21   FAs like Plaintiff to gather financial information on each client and then provide suitable

22   investment advice on the basis of this profiling process.  *See* FINRA Rules 2090 & 2111.

23        There is no factual dispute that Plaintiff Tsyn performed the very tasks the DOL has

24   deemed exempt.  Plaintiff has testified that his "primary role" was to "design and maintain

25   comprehensive wealth plans to address estate, retirement income, and business succession needs,"

26

27

28

DEFENDANT'S POINTS & AUTHORITIES ISO ITS MOTION FOR PARTIAL SUMMARY JUDGMENT

Heinicke Decl. ¶ 1, Ex. A (Tsyn Deposition Transcript)[1] at 100:7-9, 100:23-102:1, 103:20-24; *id.* at Dep. Ex. 4 (resume)).  Plaintiff has conceded that:

- When working with a client, he would gather and consider information on each client's "entire financial picture," including "income," "assets," "other investments" and "debts," and that the duty to understand this information was ongoing.  (Tsyn Dep. at 42:23-44:14, 41:1-9);

- His "task" as an FA was to "understand [his] client," and "match an appropriate investment product to their specific needs."  (*Id.* at 42:14-17);

- In the process of doing this, he would give each "client advice in the form of recommendations," and, when doing so, one of his obligations "was to advise the client on the potential advantages and disadvantages of each of [his] recommendations."  (*Id.* at 52:17-22, 82:16-19); and

- He spent a significant amount of his time engaged in "marketing" *i.e.*, "promoting [his] services" that he could provide to clients through Wells Fargo, and he also looked for ways to promote other Wells Fargo services, such as meeting the "banking needs" of the client through "lines of credit, checking, savings …[and] mortgages.")  (*Id.* at 63:20-64:11, 74:1-17.)

As the Ninth Circuit has held, when the employee's duties substantially "track" duties that the DOL has deemed exempt under section 541.203, "that says it all," and the employee is exempt as a matter of law.  *In re Farmers Ins. Exch., Claims Representatives' Overtime Pay Litig.*, 481 F.3d 1119, 1124, 1129 (9th Cir. 2006) (finding insurance claim adjustors exempt under another subdivision of section 541.203 and holding that an employee need not perform all of the tasks listed in the section to be exempt under it).

Because Plaintiff Tsyn cannot dispute the fact that he performed the tasks specified as exempt in section 541.203(b), he instead urges an improper legal construction of the regulation. Plaintiff effectively contends that because he received transaction-based incentive compensation and because he was evaluated at least in part on the amount of revenue he generated, all of the various tasks he performed "funneled" into a transaction, and so all of his tasks fall under the rubric of sales thereby rendering him non-exempt under the final sentence of section 541.203(b).

---

[1]    "Tsyn Dep." refers to Plaintiff Tsyn's deposition transcript, the cited portions of which are attached as Exhibit A to the Declaration of Malcolm Heinicke ("Heinicke Decl.") filed concurrently herewith.

This effort fails at multiple levels.  **First**, the 2004 regulations, and section 541.203(b) in particular, were clarifying regulations that did not alter the decades of direct regulatory guidance stating that registered FAs like Plaintiff are properly classified as exempt.  **Second**, Plaintiff's labelling argument proves too much—most if not almost all financial service employees have customers who eventually place transactions that yield revenue, but when adopting the 2004 regulations, the DOL made clear that "many financial services employees qualify as exempt administrative employees, even if they are involved in some selling to consumers."  69 Fed. Reg. 22,122, 22,146 (Apr. 23, 2004).

    **Third**, Plaintiff's urged construction contravenes section 541.203(b) itself.  The regulation is dichotomous—if the employees perform the exempt tasks, then they are exempt, but if not, then they are not exempt if they primarily engage in sales.  The reading Plaintiff urges would improperly render all but the last sentence of the regulation surplusage.  In response to an earlier wave of litigation in which plaintiffs asserted the same "sales" argument, the DOL issued an Opinion Letter squarely concluding that licensed FAs generally meet the administrative exemption.  In doing so, the DOL made clear that if an employee performs some or all of various tasks listed as exempt in section 541.203(b) (*i.e.*, gathering client information and making suitable recommendations), then that employee is necessarily **not** engaged in mere, non-exempt sales work.  *See* Opinion Letter Fair Labor Standards Act (FLSA), 2006 WL 3832994, at *1, *5 (Nov. 27, 2006) ("2006 DOL Opinion Letter") (the "description of the duties of these registered representatives suggests that they have a primary duty other than sales, *because* their work includes collecting and analyzing a client's financial information, advising the client about the risks and the advantages and disadvantages of various investment opportunities . . . and recommending to the client only those securities that are suitable for the client's particular financial status, objectives, risk tolerance, tax exposure, and other investment needs") (emphasis added); *see also Auer v. Robbins*, 519 U.S. 452, 459-61 (1997) (reiterating the deference given to DOL Opinion Letters and noting that they are controlling unless "plainly erroneous or inconsistent with the regulation"); *In re Farmers*, 481 F.3d at 1129 (same).  A court confronting the same issue has similarly concluded that an FA who worked at branch and grocery store outlets and spent half

DEFENDANT'S POINTS & AUTHORITIES ISO ITS MOTION FOR PARTIAL SUMMARY JUDGMENT

of his time cold-calling was exempt as a matter of law because, even though he characterized his various tasks as sales-related, he performed the exempt tasks listed in the regulation. *See Hein v. PNC Fin. Servs. Group, Inc.*, 511 F. Supp. 2d 563 (E.D. Pa. 2007) (granting summary judgment and then denying the pending conditional certification motion as moot).

For these reasons, WFA respectfully requests that this Court grant its Motion for Partial Summary Judgment on Plaintiff Tsyn's Second Cause of Action, *i.e.*, his individual FLSA claim.

## II.   RELEVANT PROCEDURAL HISTORY

Plaintiff filed this action on March 28, 2014, alleging, *inter alia*, that he and WFA FAs throughout the nation are misclassified as exempt employees in violation of the FLSA.

On September 24, 2015 Plaintiff moved for conditional certification of a national class of FAs in WFA's Wealth Brokerage Services ("WBS") business line, and through a separate pleading, WFA has strenuously opposed such certification (*see* ECF No. 68).  After the deadline to amend the complaint had passed, Plaintiff sought leave to file a Third Amended Complaint ("TAC").  Wells Fargo did not oppose this motion, and Plaintiff filed the TAC on October 21, 2015.  The TAC adds three new plaintiffs, including one WBS FA, Catherine Horan-Walker. Plaintiff Horan-Walker has not sought conditional certification of her FLSA claims.  Wells Fargo reserves the right to seek summary judgment with respect to her individual FLSA claim.

## III.   UNDISPUTED FACTS

Plaintiff's own deposition testimony provides the key, undisputed facts:

### A.   Plaintiff Worked for WFA as a Licensed, Financial Services Professional

Plaintiff Tsyn is a former FA in the WBS division where he was required to be a "registered representative" with the Financial Industry Regulatory Authority ("FINRA").[2] Plaintiff was employed by WFA as an FA for approximately four years, from 2008 until his resignation in December 2012.  (Tsyn Dep. at 22:15-25.)  At the time of his hire, Plaintiff had over

---

[2]   A "registered representative" is an individual who is registered with FINRA (formerly known as the National Association of Securities Dealers ("NASD")) and has passed the Series 7 and Series 63 licensing examinations.  (Tsyn Dep. at 17:24-18:2; Heinicke Decl. ¶ 2, Ex. B (Egan Deposition Transcript) at 32:21-33:4.)  SEC/FINRA rules require an individual to possess those licenses to trade any security.  *See* FINRA Rule 1031.  Topics covered on those exams include various securities, regulations, and ethics.  (Tsyn Dep. at 35:23-36:4.)

ten years of experience as a registered representative, working in "similar" roles at others firms. (*Id*. at 17:9-22:16, 197:14-22, 194:15-195:1.)  Plaintiff is a college graduate with numerous professional licenses, specifically, the Series 7, 63, 65, and an insurance license.  (*Id*. at 16:23-17:1, 23:5-13, 28:10-12; Heinicke Decl. ¶ 1, Ex. A at Dep. Ex. 1 (job application).)  Plaintiff now works as a registered representative at Fidelity Investments, and he has described himself in another pending lawsuit as a "very savvy financial advisor."  (Tsyn Dep. at 200:15-24, 203:14-17; Heinicke Decl. ¶ 1, Ex. A at Dep. Ex. 16.)

Plaintiff received a guaranteed draw/salary in a gross amount well above the pertinent FLSA $455 weekly minimum for exempt employees, and he was also eligible for significant additional incentive compensation under the applicable compensation plan.  (Tsyn Dep. at 148:9-12, 201:24-202:3; Heinicke Decl. ¶ 1, Ex. A at Dep. Ex. 15.)  Plaintiff estimates that ten to fifteen percent of his business consisted of "wrap" accounts, which are fee-based accounts where he was compensated based on a percentage of the total assets under management (not on a transaction-by-transaction basis).  (Tsyn Dep. at 86:6-87:4.)  Consistent with industry practice, WFA classified Plaintiff as an exempt employee who was not eligible for premium overtime pay.  Plaintiff admits that none of the seven firms he has worked for as a registered representative since 1997 has ever treated him as non-exempt or paid him premium overtime.  (*Id*. at 192:23-193:2, 193:4-194:13, 195:10-196:1, 197:2-6.)

At WFA, Plaintiff had approximately 500 client accounts all of which came to him through internal Wells Fargo sources, *i.e.*, he did not "cold-call" them.  (*Id*. at 63:12-15; 87:8-15; 106:17-23; 183:2-9.)  Approximately 30 to 40 of his clients had investable assets in excess of $250,000. (*Id*. at 87:16-88:3.)

## B.  <u>Plaintiff's Specific Job Duties</u>

At the end of Plaintiff's deposition, Plaintiff's counsel asked leading questions prompting Plaintiff to characterize his FA positions at WFA and six other brokerage firms as "sales" jobs:

> BY MR. WYNNE:  Q.   Mr. Tsyn, is the financial advisor job at WFA a sales position?
> MR. SANCHEZ:  Objection.  Leading.
> THE WITNESS:  Yes.

DEFENDANT'S POINTS & AUTHORITIES ISO ITS MOTION FOR PARTIAL SUMMARY JUDGMENT

BY MR. WYNNE: Q.  Is there anything that you did at Wells Fargo that is not
somehow related to your sales efforts?
MR. SANCHEZ:  Objection.  Leading and form of the question.
THE WITNESS:  Everything revolved around sales.
BY MR. WYNNE: Q.  The financial advisor jobs that you had at previous
broker-dealers, were those also sales positions?
A.  Yes.

(Tsyn Dep. at 204:13-205:4.)[3]  When questioned why he characterized his job as "selling,"

Plaintiff explained "I view my job as selling, yes, because that is how I get compensated."  (*Id.* at

47:15-18.)  Regardless of how he was compensated, his own testimony makes clear that he

performed the duties required of him under pertinent securities rules and also the very tasks that

the DOL has deemed exempt.

Critically, Plaintiff clarified that when he used the term "sales," he was referring to all

tasks that ultimately "funneled into the sale," and these tasks included "getting to know the client,

making suitable recommendations, designing plans for them long and short term, [and] managing

their portfolio."  (*Id.* at 210:2-9.)  Plaintiff further clarified that when he characterized his job as

one of "selling products," that description was "synonymous" with "designing short-term and

long-term investment plans or strategies."  (*Id.* at 54:15-25.)  And, Plaintiff conceded that,

consistent with his own resume describing his position at WFA, his "primary role" at WFA was to

"design and maintain comprehensive wealth plans to address estate, retirement income, and

business succession needs."  (*Id.* at 101:15-20, 103:20-103:24.)  Further confirming that the job he

labelled as "sales" actually consisted of exempt tasks, Plaintiff admitted that:

- He has in the past described his primary tasks or duties at WFA as "managing portfolios" and this primary task entailed "a process where I would get to know the client, I would present them with investment products, and as things changed for my client's needs I would give them more recommendations on the investment products."  (*Id.* at 40:10-21.)

- He has described his business to clients as "wealth management."  (*Id.* at 72:20-22).  In his words, this meant "[u]nderstanding their financial needs, offering them

---

[3]   Although WFA addresses this testimony on its merits in this Motion, WFA asserts that this
testimony was obtained improperly through leading questions and accordingly objects to its use.

DEFENDANT'S POINTS & AUTHORITIES ISO ITS MOTION FOR PARTIAL SUMMARY JUDGMENT

appropriate financial solutions, and updating those financial solutions as their needs evolve." (*Id*. at 72:23-73:2.)

- As a WFA FA, his task was to understand [his] client, and [his] job as a financial consultant was to match an appropriate investment product to their *specific* needs." (Tsyn Dep. at 42:14-17 (emphasis added)). This entailed understanding his client's objectives by gathering various pieces of information about his client's circumstances and goals. (*Id*. at 42:14-44:14.)

- Plaintiff's role when prospective clients were referred to him was "to provide them with financial advice on how [Plaintiff] could meet their needs with certain financial products." (*Id*. at 60:6-12.)

- A business plan that he drafted while at WFA was truthful when it stated: "My business is wealth management. I design short and long-term investment plans that satisfy my [clients'] needs to fight inflation, protect assets, and transfer funds to loved ones as painlessly as possible." (*Id*. at 76:7-77:13, 81:11-18; Heinicke Decl. ¶ 1, Ex. A at Dep. Ex. 3.)

- Plaintiff's employment application accurately described his major responsibilities in his previous roles as a registered representative—roles, which he testifies were "similar" to his work at WFA—as "manag[ing] financial portfolios" — and nowhere in his application did he describe those prior responsibilities as "selling." (Tsyn Dep. at 75:21-76:6; Heinicke Decl. ¶ 1, Ex. A at Dep. Ex. 1.)

- He never told any of his clients that he viewed his primary role or primary duty to be selling them financial products. (Tsyn Dep. at 212:1-5.)

Plaintiff's testimony regarding the life cycle of investment advice aptly summarizes his work: After obtaining an internal referral, Plaintiff would make contact with the client and gather financial information per the Know Your Customer Rule. (*Id*. at 94:13-95:1.) This process entailed gathering the clients' financial records and discussing their financial documents with them. (*Id*. at 95:6-16.) From there, he would start to examine what potential investment options there were to meet each client's needs. (*Id*. at 95:22-96:6.) He would then recommend products "that seemed most suitable." (*Id*. at 96:17-21.) The client would be offered "an array of investments that might meet a need," as well as, "the benefits and features along with the risks would be discussed." (*Id*. at 96:22-97:3.) The next step was obtaining an agreement with the client as to which recommendation the client wanted to accept. (*Id*. at 97:8-11.)

Plaintiff's involvement with the client did not end with a single transaction. (*Id*. at 97:12-14.) Rather, he would continue monitoring the performance of the portfolio and the individual

investments in it as well as market or financial news.  (*Id*. at 97:15-98:4.)  This was on ongoing

process, in which Plaintiff maintained communication with the client to inform them about their

investments and determine if the investments still met their needs or if those needs had changed.

(*Id*. 98:5-16.)  If performance was not satisfactory or the client's needs had changed, Plaintiff

would go through the process of making new recommendations.  (*Id*. at 98:17-22.)

Focusing on the specific exempt tasks set forth in 29 C.F.R. § 541.203(b), Plaintiff admits

that as a WBS FA, he collected and analyzed information regarding his client's income, assets,

investments or debts; determined which financial products best met the client's needs and

financial circumstances; advised his clients regarding the advantages and disadvantages of

different financial products; and engaged in marketing and promotional activities.

### 1.     Plaintiff Collected and Analyzed His Clients' Financial Information

Plaintiff admits that, as a registered representative, he was required to and did in fact

follow FINRA's "Know Your Customer" and "Suitability" Rules, which were created by

regulation to protect the investing public.  (*See id*. at 29:7-10, 36:23-38:6, 39:20-23, 41:10-22;

45:4-10; Heinicke Decl. ¶ 1, Ex. A at Dep. Ex. 2); *see also* FINRA Rule 2090 ("Every member

shall use reasonable diligence, in regard to the opening and maintenance of every account, to

know (and retain) the essential facts concerning every customer and concerning the authority of

each person acting on behalf of such customer"); FINRA Rule 2111 (requiring, in part, that a

broker-dealer "have a reasonable basis to believe that a recommended transaction or investment

strategy involving a security or securities is suitable for the customer, based on the information

obtained through the [profiling process]").)

As Plaintiff explains, the Know Your Customer Rule "means understanding the client's

financial needs, their experience with investing, their basic knowledge, their financial net worth."

(Tsyn Dep. at 38:2-6.)  In fulfilling his obligations under this rule, Plaintiff admits that he would

gather information about each client's income, assets, current investments, debts, risk tolerance,

investment objectives, and personal needs (*e.g.*, whether they needed a certain level of liquidity or

when they were going to retire).  (*Id*. at 38:7-39:10.)

1      As Plaintiff further admits, FINRA's Suitability Rule also necessitated that he gather

2 information about each client's financial situation because it requires the FA to have a reasonable

3 basis to believe that an investment strategy involving securities is suitable for that client based on

4 reasonable diligence of the customer's profile.  (*Id*. at 41:10-22, 42:14-43:1, 44:20-45:10.)  When

5 determining whether an investment was suitable, Plaintiff would want to know his customers'

6 "entire financial picture," including, among other items, their tax status, cash flow, and their

7 investment experience, objectives, and time horizons.  (*Id*. at 42:18-44:14.)

8      Plaintiff began gathering this financial information upon starting a client relationship.  (*Id*.

9 at 65:12-19, 94:21-95:1.)  This was not a one-time process; instead, Plaintiff remained

10 knowledgeable about each client and monitored his client's investment objectives for change.  (*Id*.

11 at 41:1-9.)  Accordingly, he would reach out to clients regularly (at least annually and for certain

12 clients quarterly) to determine if the investment portfolio in which he had placed them in was still

13 meeting their needs.  (*Id*. at 78:4-25, 98:5-99:4.)

14           **2.**       **Plaintiff Determined Which Investments Best Suited His Clients**

15      As stated on the face of the rule, the suitability requirement mandates not only that the FA

16 gather pertinent financial information, but also that the FA use that information to determine

17 which investment options are, as the name implies, best "suited" to the client.  *See* FINRA Rule

18 2111.  Plaintiff acknowledges that he followed FINRA's Suitability Rule, and that, consistent with

19 this rule, his "job as a financial consultant was to *match an appropriate investment product to*

20 *their [clients'] specific needs*."  (Tsyn Dep. at 42:14-17 (emphasis added); *see also id.* at 36:23-

21 37:1, 41:10-22, 77:7-13, 81:11-18, 213:8-10; Heinicke Decl. ¶ 1, Ex. A at Dep. Ex. 3 (business

22 plan developed by Plaintiff, accurately stated that "I design short and long-term investment plans

23 *that satisfy my clients' needs . . .*") (emphasis added).)

24      Plaintiff endeavored to recommend investment options "that met that client's needs and

25 financial circumstances."  (Tsyn Dep. at 56:1-5.)  When making his recommendations, Plaintiff

26 would consider the client information that he collected.  (*Id*. at 48:25-49:4.)  When making his

27 recommendation, Plaintiff would "compare and evaluate" competing products so that he could

28 make a "suitable recommendation" to the client.  (*Id*. at 50:5-9.)  His client advice process was, as

1   he put it, "[t]o understand the client's needs." (*Id.* at 77:22-23.) Plaintiff concedes that his

2   recommendations were not "a standard product or a standard strategy", but rather "customized to

3   [the customers'] particular needs as [he] analyzed them." (*Id.* at 61:3-6.)

4                **3.**       **Plaintiff Advised His Clients on Advantages and Disadvantages**

5        As Plaintiff summarized it, his role with clients was to "provide them with financial advice

6   on how [Plaintiff] could meet their needs with certain financial products." (*Id.* at 60:6-12.)

7   Plaintiff admits that one of his obligations in doing so "was to advise the client on the potential

8   advantages and disadvantages of each of [his] recommendations." (*Id.* at 52:17-22.) Plaintiff

9   explains: "Based on [the client's] particular risk tolerance, I had to explain that when there was an

10   investment product offer, what the potential benefits were, what the potential pitfalls were." (*Id.*

11   at 52:25-53:3; *see also id.* at 55:4-10 (discussing the positives and negatives of those investments

12   in this manner is part of clients' advice), 119:10-120:-25; Heinicke Decl. ¶ 1, Ex. A at Dep. Ex. 8

13   (for high net worth clients, he also discussed with them the risks of *not* investing).)

14        In his WFA business plan, Plaintiff wrote that an attribute of his "ideal client" is one that

15   "values my advice." (*Id.* at 82:9-15; Heinicke Decl. ¶ 1, Ex. A at Dep. Ex. 3.) Moreover,

16   Plaintiff, who logged some notes of his client interactions, testified that Exhibit 6 to his deposition

17   reflected a typical client interaction record. (*Id.* at 105:8-10, 113:25-115:5; Heinicke Decl. ¶ 1,

18   Ex. A at Dep. Ex. 6 (log entry of client meeting, providing in the second paragraph: "Other risks

19   explained: price & yield can fluctuate, non fdic insured, 12 mo cdsc of 1%. Benefits: competitive

20   rate and monthly income.").)

21                **4.**       **Plaintiff Engaged in Marketing, Servicing, and Promotional Work**

22        Plaintiff testified that marketing (meaning "promoting [his] services") comprised a

23   significant portion of his time as an FA. (Tsyn Dep. at 74:1-14.) Additionally, his 2010 goals, as

24   set forth in his business plan, include "marketing," which meant "continu[ing] to focus on

25   productive referral sources." (*Id.* 80:7-14; Heinicke Decl. ¶ 1, Ex. A at Dep. Ex. 3.) Plaintiff not

26   only promoted the services he could provide at Wells Fargo to potential and existing clients, but

27   he also advised and trained bankers on what to look for in identifying potential referrals to

28   Plaintiff's brokerage services. (Tsyn Dep. at 66:9-67:12, 112:21-113:1.) Plaintiff also reviewed

1  his clients' financial information to identify whether they had any needs that could be met via a

2  referral to the banking side of the business (*e.g.*, for lines of credit, checking, savings, and

3  mortgages).  (Tsyn Dep. at 63:20-64:11.)

4  **C.**      **Temporal Allocation of Plaintiff's Time**

5  Plaintiff testified that, as a WBS FA, he spent his time approximately as follows:

6  •    Forty percent marketing, which means promoting his services, (*id*. at 74:1-17);

7  •    Twenty percent designing short and long-term investment plans, (*id*. at 73:3-25);

8  •    Twenty percent meeting with clients, (*id*. at 75:4-6);

9  •    Under five percent staying current on economic events, (*id*. at 75:1-3);

10 •    Ten percent completing required paperwork in conjunction with implementing the
       transactions in connection with the investment options to which his clients agreed,
11     (*id*. at 74:18-25).  Notably, Plaintiff indicated he had an assistant to whom he
       delegated certain tasks (*id*. at 164:20-24)); and,
12

13 •    Five percent data input, Envision, Morningstar, and preparing for client meetings.
       (*Id*. at 75:8-13.)[4]
14

15 **D.**      **Plaintiff Had Considerable Discretion and Independence in His Job**

16 Although he worked out of two different offices, Plaintiff had no manager in either of

17 those locations.  (*Id*. at 122:11-16.)  His supervisor from 2008 until early 2010 (Josh Smith) was

18 located in a different city, and his supervisor during the pertinent period here (Dan Hilken) had an

19 office in a different building.  (*Id*. at 61:7-62:17.)  Plaintiff spoke with Mr. Hilken on a weekly

20 basis and met in person with him only once per month.  (*Id*. at 121:17-20, 122:17-19.)  The

21 discussions at these monthly meetings were "about growing [Plaintiff's] business" and not about

22 instructions concerning Plaintiff's investment advice.  (*Id*. at 137:14-138:7.)  Plaintiff admits that:

23 •    He did not send the information he gathered on his clients to Mr. Hilken for review,
       (*id*. at 123:19-23);
24

25 •    A supervisor was not present when Plaintiff met with clients to update them on the
       performance of their portfolios, and he did not need preapproval to have these
26

27 ⁴  Envision and Morningstar were software tools that helped Plaintiff determine suitable
   investments, although the ultimate investment recommendation was a judgement call made by
   Plaintiff based on his analysis and knowledge of the client and the client's financial situation.  (*Id*.
28 at 48:3-49:4, 50:18-51:11, 102:18-19.)

discussions, explaining, "I would just pick up the phone and do my job as outlined," (Tsyn Dep. at 130:13-20, 131:7-12); and

- Although he believes that his supervisors had access to all electronic information on the system, he does not know whether any supervisor ever reviewed a wealth management plan that he designed for his clients. (*Id.* at 129:9-130:12.)

Thousands of investment options (including many not proprietary to Wells Fargo) were available to Plaintiff to choose from when making recommendations to his clients. (*Id.* at 48:12-16.) In addition, he also occasionally worked with a product that was not approved and for which he could seek approval. (*Id.* at 125:8-10.) For example, he needed preapproval to recommend a market-linked CD, but that was because the asset is highly illiquid, and the FAs had been "rigorous[ly]" trained "to understand the risks so [that] we could explain those risks to [the] clients and so that we could identify the appropriate clients for these investments." (*Id.* at 133:13-134:1.) Although he would receive pushback from WFA "if something smelled fishy with an investment recommendation," this occurred only "[m]aybe a handful of times." (*Id.* at 131:23-132:9.)

When questioned about compliance issues, Plaintiff testified that he very frequently "toed the line" in trying to comply with "the stringent rules." (*Id.* at 132:12-21.) Plaintiff conceded that, as a registered representative, he had to follow the rules of regulatory bodies, regardless of who his employer was, and that such rules exist for the protection of the investing public and to prevent illegal activity by registered representatives. (*Id.* at 37:2-38:1.) He admits that he was never placed on heightened supervision (*i.e.*, where someone is having compliance issues repeatedly and the firm places "narrower bumpers" on what that person can and cannot do). (*Id.* at 138:8-139:1.)

## IV.   ARGUMENT

A district court must grant a motion for summary judgment if the movant shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). The instant motion is based on Plaintiff's own deposition testimony, and so there is no factual dispute concerning the tasks he performed. Instead, the only issue is a question of law, *i.e.*, the proper interpretation and application of the administrative exemption to these undisputed facts. Plaintiff cannot as a matter of law escape summary judgment by labeling all that he did as sales

1    simply because the tasks he performed often (though not always) culminated in a transaction for

2    which he was compensated.  The regulations and pertinent DOL guidance make clear that a

3    licensed Financial Advisors who performs the exempt tasks listed in the pertinent regulations is

4    exempt even if the tasks he performs usually (though not always) culminate in a transaction or

5    sale.  This is especially true here because Plaintiff admits that he spent only a small minority of his

6    time actually effectuating transactions.

7         A.        **The Administrative Exemption as Applied to Financial Advisors**

8              1.        **DOL Regulations Have Long Stated that FAs Satisfy the Duties Test**

9              To establish the administrative exemption, an employer need only show that a salaried

10   employee's primary duty (a) was the "performance of office or non-manual work directly related

11   to the management or general business operations of the employer or the employer's customers";

12   and (b) "include[d] the exercise of discretion and independent judgment with respect to matters of

13   significance."  *See* 29 CFR § 541.200(a)(2), (3).[5]  "Determination of an employee's primary duty

14   must be based on all the facts in a particular case, with the major emphasis on the character of the

15   employee's job as a whole."  29 CFR § 541.700(a).

16             Since the inception of the administrative exception in the 1940s, the DOL regulations have

17   made clear that customers brokers in brokerage firms (now referred to as registered

18   representatives) satisfy both duties prongs of the this test.  *See* 29 C.F.R. § 541.205(c)(5) (1949)

19   ("customers' brokers in stock exchange firms" meet the requirement that an administrative

20   employee perform "non-manual work directly related to the management policies or general

21

_____

22   [5]    In addition to the "primary duty" test, and like the other "white collar" exemptions, the
     administrative exemption requires that the employee be compensated "on a salary or fee basis at a

23   rate of not less than $455 per week." 29 CFR § 541.200(a)(1).  Plaintiff cannot dispute the fact
     that he was paid on a salary basis. (Tsyn Dep. at 139:10-23, 142:20-143:22.)  Specifically,

24   Plaintiff admits he received a guaranteed draw that was paid regardless of eligibility for incentive
     compensation.  (*Id.*)  And, the payment of any additional and variable compensation does not

25   undermine the FA's salaried status.  *See, e.g.*, 2006 DOL Opinion Letter at *7 n.5 (opining that the
     salary basis test was satisfied where FAs were guaranteed at least $455 per week *plus commission*

26   *once the draw was covered*, explaining "[w]hat matters is that the employee receives no less than
     the weekly-required amount as a guaranteed salary constituting all or part of total compensation,

27   which amount is not subject to reduction due to the quality or quantity of the work performed.");
     *Boykin v. Boeing Co.*, 128 F.3d 1279, 1282 (9th Cir. 1997) (holding that "additional compensation

28   besides the salary is not inconsistent with the salary basis of payment").

1  business operations of [his/her] employer or [his/her] employer's customers"); 29 C.F.R. §

2  541.207(d)(2) (1949) (the exercise of discretion and independent judgment with respect to matters

3  of significance "includes the kind of discretion and independent judgment exercised by a

4  customer's man in a brokerage house in deciding what recommendations to make to a customer

5  for the purchase of securities").[6]  Subsequent iterations of the Administrative Exemption

6  Regulation are consistent.  *See e.g.*, 29.C.F.R. § 541.205(c)(5) (1973); 29 C.F.R. § 541.207(d)(2)

7  (1973).  Notably, federal regulations outlining both prongs of the test caution that it is impossible

8  to list all exempt positions and yet, among the few examples provided, the DOL specifies that

9  financial consultants and customer representatives in financial firms satisfy each test.  *See id.*

10 §§ 541.201(a)(3); 205(c)(5); 205(d); 541.207(d)(2) (1973).

11        The 2004 clarifying regulations confirm that financial services employees "generally meet

12 the duties requirements for the administrative exemption" if their duties "include":

13        collecting and analyzing information regarding the customer's income, assets,
          investments or debts; determining which financial products best meet the
14        customer's needs and financial circumstances; advising the customer regarding
          the advantages and disadvantages of different financial products; and marketing,
15        servicing or promoting the employer's financial products.  However, an employee
          whose primary duty is selling financial products does not qualify for the
16        administrative exemption.

17 29 C.F.R. § 541.203(b).  Section 541.203(b) does not require that employees primarily perform

18 these exempt tasks.  When promulgating this regulation, the DOL stated that "many financial

19 services employees qualify as exempt administrative employees, *even if they are involved in some*

20 *selling to consumers*."  69 Fed. Reg. 22,122, 22,146 (Apr. 23, 2004) (emphasis added).

21        Leaving essentially no doubt on the topic, the DOL responded to earlier lawsuits making

22 the same argument Plaintiff asserts here by issuing the 2006 Opinion Letter concluding that

23 registered representatives, *i.e.*, financial representatives who are licensed with NASD/FINRA,

24

25 _____

26 [6]   There can be no question that the DOL was applying the exemption to the employees that we
      now refer to as registered financial advisors or registered representatives.  *See* 70 Fed. Reg. 20,
27 424, 20,428 (Apr. 19, 2005) (citing contemporaneous documents and demonstrating that a
      "customer's man" in a brokerage firm was the predecessor term used to describe a "registered
28 representative").

generally satisfy the administrative exemption.  *See* 2006 DOL Opinion Letter at *1.  The DOL

concluded that the administrative exemption covered the subject FAs because they:

> [1] "service their employer's financial services business by engaging in promotion
> and business development activities, including the marketing, servicing, and
> promoting of the employing firm's financial services and products, and by making
> themselves visible to the appropriate segments of the public in order to meet and
> retain potential new clients for their employing firm" [and (2) exercise discretion
> and independent judgment with respect to matters of significance in that they]
> "assess the client's investment objectives, investment experience, and tolerance for
> risk—significant factors in determining the investment advice the registered
> representative will provide to the client based on the client's particular
> circumstances—and then compare and evaluate possible investment options and
> render advice only after all the various possibilities have been considered."

2006 DOL Opinion Letter at *5-6.  The DOL emphasized that the exemption applies even though

"[a]s an incident to providing their clients with investment advice, registered representatives *also*

*bring about the purchase or sale of such investments for their clients and execute the actual*

*transactions that result from their financial advice . . . .".  Id.* at *2 (emphasis added).  Federal law

requires courts to give deference to DOL Opinion Letters interpreting its own regulations.  *Auer*,

519 U.S. at 459-61 (DOL Opinion Letters are controlling unless "plainly erroneous or inconsistent

with the regulation"); *In re Farmers*, 481 F.3d at 1129 (same).

In short, decades of DOL regulatory guidance has made clear that performing the tasks

deemed exempt in section 541.203(b) qualifies an FA for the exemption, even though the

performance of these tasks culminates in or otherwise relates to a transaction or sale.

### 2.      The DOL Has Not Challenged Industry-Wide Classification Practice

WFA is unaware of any major brokerage firm to have reclassified its FAs as hourly

employees.  Plaintiff's experience is consistent.  (Tsyn Dep. at 192:23-193:23, 194:15-196:1,

196:19-197:6 (attesting that none of the *seven* different financial services firms he has worked for

since entering the industry as a registered representative in 1997 has paid him on an hourly basis

with premium overtime, including his present employer, Fidelity Investments).)

The DOL has never initiated any action against the major brokerage firms concerning their

widespread and well-known practice of classifying FAs as exempt.  The Supreme Court has made

clear that such DOL inaction is telling.  *See, e.g.*, *Christopher v. SmithKline Beecham Corp.*, 132

S. Ct. 2156, 2168 (2012) (rejecting the DOL's newfound determination that a class of

1   pharmaceutical employees was not exempt and holding that "where, as here, an agency's

2   announcement of its interpretation is preceded by a very lengthy period of conspicuous inaction,

3   the potential for unfair surprise is acute . . . while it may be 'possible for an entire industry to be in

4   violation of the [FLSA] for a long time without the Labor Department noticing,' the 'more

5   plausible hypothesis' is that the Department did not think the industry's practice was unlawful.")

6   (quoting *Yi v. Sterling Collision Ctrs., Inc.*, 480 F.3d 505, 510–511 (2007)).  Here, of course, the

7   DOL has not reversed course and has instead confirmed its decades of regulatory guidance and

8   non-enforcement with an Opinion Letter stating that licensed financial advisors are exempt.

9                **B.      Plaintiff is Exempt Because His Duties Track Those in § 541.203(b)**

10          Section 541.203(b) identifies four job functions that will generally qualify a financial

11   services employee for the administrative exemption: (1) collecting and analyzing customer

12   financial information; (2) determining which products best meet the customer's needs, (3)

13   advising on the advantages and disadvantages of different products, and (4) marketing, servicing,

14   or promoting the employer's financial products.  *See* 29 C.F.R.§ 541.203(b).  Plaintiff admits he

15   performed all of these functions.  Plaintiff admits that he was bound by and did in fact follow

16   FINRA's "Know Your Customer" and "Suitability" Rules, which required him to collect detailed

17   information about each of his customer's financial circumstances and particular needs and, based

18   upon his analysis of that information, determine which financial products best suited the

19   customer's specific needs.  He admits that he advised clients "on the potential advantages and

20   disadvantages of each of [his] recommendations." (Tsyn Dep. at 52:17-22.)  Plaintiff admits he

21   engaged in marketing, which he states means promoting his services.  (*Id.* at 74:15-17.)  He also

22   trained bankers on how to recognize potential candidates for WFA's brokerage services, and he

23   identified potential referrals of brokerage clients to WFA's banking business.  (*Id.* at 66:9-67:12,

24   112:21-113:1.)  Plaintiff has aptly summarized his role as follows:  "my task was to understand

25   my client, and my job as [an FA] was to match an appropriate investment product to their *specific*

26   needs." (*Id.* at 42:14-17 (emphasis added).)

27          The Ninth Circuit has held that when the employee's duties substantially "track" duties

28   that the DOL has deemed exempt in section 541.203, "that says it all," and the employee is

1    exempt as a matter of law.  *In re Farmers*, 481 F.3d at 1124, 1129 (holding claims adjusters

2    satisfied both prongs of the administrative exemption where they were "required to do virtually all

3    of the very things that § 541.203 contemplates," and noting that "[t]he regulation, however, does

4    not require the adjuster to perform each and every activity listed").  Here, because Plaintiff's

5    admitted job functions mirror each of the exempt duties delineated in section 541.203(b), he was

6    exempt as a matter of law under both prongs of the primary duty test.  Having admitted that he

7    performed these exempt tasks, Plaintiff may argue that he can nevertheless escape summary

8    judgment by labeling his primary duty as sales and then cloaking his claim in the one-sentence

9    exception at the end section 541.203(b).  This effort fails as a matter of law at several levels.

10          ***First***, Plaintiff cannot establish that the 2004 regulations, or the salesperson exception in

11   section 541.203(b) in particular, somehow silently reversed decades of regulatory guidance and

12   standard industry practice.  As the Ninth Circuit has held, the 2004 regulations and section

13   541.203 were merely clarifying regulations, and they therefore did not alter the decades of direct

14   regulatory guidance stating that registered financial advisors like Plaintiff are properly classified

15   as exempt.  *See In re Farmers*, 481 F.3d at 1128 (holding that the 2004 regulation revisions did

16   "not represent a change in the law" and applying the pre-2004 regulations and the 2004 clarifying

17   regulations together); *see also In re American Family Mut. Ins. Co. Overtime Pay Litig.*, No. 06-

18   cv-17430, 2007 WL 2936319, at *6, n.2 (D. Colo. Oct. 9, 2007) (citing 69 Fed. Reg. 22193 for the

19   proposition that the 2004 statement of the test for the exemption is "very similar, if not

20   functionally identical to the former test" and that the updated regulations "clarify but make no

21   substantive changes in the primary duty test requirement for the administrative exemption");

22   Opinion Letter Fair Labor Standards Act (FLSA), 2005 WL 3308596, at *1 (Aug. 26, 2005)

23   ("[T]here were no substantive changes in the primary duty test requirements for the administrative

24   exemption" in the 2004 regulations).

25          ***Second***, Plaintiff's anticipated argument would prove too much – many if not most

26   financial services employees have customers who eventually place a transaction that generates

27   revenue for the employee, and the DOL has made clear that "many financial services employees

28   qualify as exempt administrative employees, even if they are involved in some selling to

-17-                                                           14-cv-02552-LB

consumers."  69 Fed. Reg. 22,122, 22,146 (Apr. 23, 2004).  When issuing the 2004 regulations, the DOL specifically embraced precedent holding that insurance agents satisfy the administrative exemption.  *See* 69 Fed. Reg. at 22145-46 (validating *Hogan v. Allstate Ins. Co.*, 361 F.3d 621 (11th Cir. 2004) (neighborhood insurance agents held exempt even though their primary duty was to "promote and sell" policies directly to clients); *Reich v. John Alden Life Ins. Co.*, 126 F.3d 1 (1st Cir. 1997) (insurance marketing representatives held exempt), *Wilshin v. Allstate Ins. Co.*, 212 F. Supp. 2d 1360 (M.D. Ga. 2002) (insurance agent who "sold" insurance products and provided customer service held exempt)).  If claims adjustors and insurance agents qualify for exempt treatment, then it is hard to imagine how highly compensated and licensed financial advisors who are required to perform the very tasks listed in the regulations do not.

*Third*, the DOL has highlighted the dichotomous nature of section 541.203(b) and made clear that if an employee performs the tasks listed there as exempt, then that employee necessarily is ***not*** primarily engaged in non-exempt sales.  In other words, because such an employee performs those exempt tasks, the employee is exempt regardless of whether their tasks "bring about the purchase or sale of such investments."  Specifically, the DOL opined:

> [The] description of the duties of these registered representatives suggests that ***they have a primary duty other than sales, because*** their work includes collecting and analyzing a client's financial information, advising the client about the risks and the advantages and disadvantages of various investment opportunities in light of the client's individual financial circumstances, and recommending to the client only those securities that are suitable for the client's particular financial status, objectives, risk tolerance, tax exposure, and other investment needs.

2006 DOL Opinion Letter at *5 (emphasis added).

In *Hein*, the plaintiff was a Series 7 licensed FA who worked at three branch facilities and two grocery store outlets during his tenure.  *See* 511 F. Supp. 2d at 567.  He spent half of his time "cold calling" potential clients to obtain their business and "was paid a commission on his sales to [his] clients."  *Id.* at 566, 573.  His "sales portfolio" included "sophisticated investment instruments" from an approved list including non-proprietary products, *i.e.*, "he did not sell checking or savings accounts, money market accounts, certificates of deposit," etc.  *Id.* at 567.

The court granted summary judgment for the employer (mooting the plaintiff's motion for conditional certification of a national collective action) for several reasons, each of which apply

1    equally here.  First, the evidence suggested that the plaintiff's most important role was to provide

2    suitable advice to his clients.  Here, Plaintiff was required to do so by regulation, and he admitted

3    that he followed this obligation and that his "primary role" at WFA was to "design and maintain

4    comprehensive wealth plans to address estate, retirement income, and business succession needs."

5    (Tsyn Dep. at 101:15-20, 103:11-24; s*ee also id*. at 42:14-17 ("[M]y task was to understand my

6    client, and my job as a financial consultant was to match an appropriate investment product to

7    their specific needs."). Second, the plaintiff in *Hein* was subject to "minimal" supervision because

8    he saw his manager "no more than twice a month," he communicated with him by phone "eight

9    times a month" and his manager "did not observe [his] meeting with clients."  *Hein*, 511 F. Supp.

10   2d at 574.  Here, of course, Plaintiff admits that he spoke with his manager by phone weekly and

11   met with him only once a month.  (Tsyn Dep. at 121:17-20, 122:17-19.)  And, his manager did not

12   sit in on his client meetings or review his investment advice.  (*Id.* at 123:19-23, 130:13-20, 131:7-

13   12.)  Third, the plaintiff in *Hein* made more than the non-exempt assistant with whom he worked,

14   something that cannot be disputed here.  *See Hein*, 511 F. Supp. 2d at 574-75.

15           Most importantly, the *Hein* court rejected the notion that plaintiff could escape summary

16   judgment by labeling his various functions as non-exempt sales because they all eventually led to

17   a transaction.  *Id.* at 573 (finding that argument "ignores [the] numerous DOL regulations to which

18   I am required to defer.")  The court found that the DOL "has sought to exempt from the FLSA

19   investment advisors in the financial services industry—*including those engaged in 'sales'*—

20   provided their sales activities are a function of their professional judgement respecting their

21   clients' best interests," *i.e.*, by performing the administrative activities listed in section

22   541.203(b)."  *Id.* at 570 (emphasis added).  Accordingly, the court found that even the plaintiff's

23   cold-calling activities were exempt because he would use at least portions of these calls to gather

24   information about "assets and investment goals."  *Id.* at 573.  The court held that any "cultivating

25   and conveying sales activities are exempt," and it held all of the plaintiff's meetings with clients

26   were exempt in nature because most of the meetings were "spent information-gathering and

27   decision-making rather than implementing an actual sale or investment."  *Id.*  In the end, the court

28   found the plaintiff exempt as a matter of law because he spent only a small amount of time on the

1    non-exempt task of "closing the sale," *i.e.*, "processing actual transactions [and] filling out

2    paperwork." *Hein*, 511 F. Supp. 2d at 573-74; *see also Bachrach v. Chase Inv. Servs. Corp.*, No.

3    06-2785, 2007 WL 3244186, at *1, *3 (D.N.J. Nov. 1, 2007) (denying Rule 23 class certification

4    of essentially the same claims and stating that "[w]ith respect to the overtime claims, the law

5    strongly suggests that [financial advisors] were not entitled to overtime" because "[a]s an example

6    of administrative employees, federal regulations list '[e]mployees in the financial services

7    industry' whose duties include collecting information about customers' finances, preparing a

8    financial plan for their customers, and ultimately selling the plan. 29 C.F.R. § 541.203 (2007).

9    This is precisely what the class members [registered financial advisors] do.").

10         Here, of course, Plaintiff has conceded that he spent the vast majority (approximately 85%)

11   of his time on tasks that are exempt under the regulations, *i.e.*, attending client meetings (20%),

12   developing investment plans (20%), marketing (40%) and staying current on economic events

13   (under 5%).  (Tsyn Dep. 73:7-75:13.)  He spent only 15% of his time processing actual

14   transactions and filling out paperwork, specifically 10% of his time "completing required

15   paperwork" and less than 5% of his time on "data input."  (*Id.* at 74:18-75:13);[7] 29 C.F.R.

16   § 541.700(b) (although an employee need not perform over 50 percent of his time on exempt work

17   to qualify for the exemption, those who do so "generally satisfy the primary duty requirement").

18         In short, the 2004 regulations confirm what earlier regulations have stated for decades –

19   licensed financial advisors are exempt under the administrative exemption, and the mere fact their

20   efforts result in a transaction or sale does not alter this analysis.

21         **C.    Plaintiff Cannot Evade The Clear Application of The Exemption**

22              **1.    Plaintiff's Individual Clients Do Not Preclude His Exempt Status**

23         Although he himself has testified that his "primary role," was to "design and maintain

24   comprehensive wealth plans to address estate, retirement income, and *business succession needs*,"

25   Plaintiff may claim that he did not service any business clients.  (Tsyn Dep. at 101:15-20, 103:11-

26   24) (emphasis added).)  From this, Plaintiff may argue that the administrative exemption does not

27   ───────────────────────

28   [7]   Notably, Plaintiff indicated he had an assistant to whom he delegated certain tasks  (*id.* at
     164:20-24.)

1   apply to any FA who advises only individual clients because the DOL issued guidance in 2010

2   suggesting that mortgage brokers who provide their company's loans to individuals are not

3   exempt.  *See* DOL Administrator's Interpretation, 2010 WL 1822423, at *9, (Mar. 24, 2010).  Not

4   surprisingly, regulatory guidance actually addressing financial advisors precludes this argument.

5       Although the DOL has consistently stated for decades that licensed FAs are exempt, the

6   DOL's guidance on *mortgage brokers* has been remarkably inconsistent.  In 1999 and in 2001, the

7   DOL issued letters opining that mortgage-loan officers do not qualify for the administrative

8   exemption.  Following the issuance of the 2004 clarifying regulations, the Mortgage Bankers

9   Association ("MBA"), a national trade association representing real estate finance companies,

10  requested a new opinion.  In 2006, the Department issued an opinion letter finding that mortgage-

11  loan officers fell within the administrative exemption under the 2004 regulations.  Four years later,

12  however, in 2010, the Wage and Hour Division again altered its interpretation of the FLSA's

13  administrative exemption as it applied to mortgage-loan officers through an "Administrator's

14  Interpretation."  Critically, the DOL then withdrew its 2006 opinion letter on mortgage brokers.

15  *See Perez v. Mortg. Bankers Ass'n.,* -- U.S. --, 135 S. Ct. 1199, 1204-05 (2015).

16      The MBA sued claiming that the DOL's actions were procedurally improper, and

17  ultimately the Supreme Court ruled that the DOL's "Administrator's Interpretation" did not

18  violate the Administrative Procedures Act, noting that such interpretive rulings "do not have the

19  force and effect of law and are not accorded that weight in the adjudicatory process."  *Id*. at 1204.

20  The Supreme Court did not address the validity of the Interpretation, but it made clear that the

21  FLSA does not impose liability when an employer has relied on DOL guidance.  *Id.* at 1209.

22      The 2010 "Administrator's Interpretation" concluded that mortgage-loan officers "have a

23  primary duty of making sales for their employers, and, therefore, do not qualify" for the

24  administrative exemption.[8]  The Interpretation further asserted that mortgage brokers do not

25

---

26  [8]   It should be noted that 2010 Interpretation suggested that mortgage brokers were non-exempt
    salespersons by applying the "administrative/production dichotomy."  The Ninth Circuit in *In re*
27  *Farmers* expressly rejected the plaintiffs' production/administrative argument and held that the
    claims adjustors there were exempt because they performed the duties listed in section 541.203 as
28  exempt.  *In re Farmers*, 481 F.3d at 1131-32; *see also Roe-Midgett v. CC Servs., Inc.*, 512 F.3d

1  satisfy the administrative exemption if they service individual customers.  Specifically, after

2  repeating the duties test requirement of "non-manual work is directly related to the management or

3  general business operations of the employer's customers," the Interpretation stated that:

> work for an employer's customers does not qualify for the administrative
> exemption where the customers are individuals seeking advice for their personal
> needs, such as people seeking mortgages for their homes.  Individuals acting in a
> purely personal capacity do not have "management or general business operations"
> within the meaning of this exemption.

7  DOL Administrative Interpretation at *8.

8          Whatever the effect of this "Interpretation" on the exempt status of mortgage brokers is, it

9  did not purport to change the DOL's clear guidance on licensed financial advisors.  The DOL did

10  not reverse the decades of actual regulations stating the registered representatives are exempt, and

11  it did not withdraw its 2006 Opinion Letter squarely stating the same.  Again, the administrative

12  exemption applies if the employee's work relates to the management or general business

13  operations "of the employer *or* the employer's customers."  29 C.F.R. § 541.200(a)(2) (emphasis

14  added).  The 2006 Opinion Letter makes clear that financial advisors who perform the exempt

15  tasks listed in section 541.203(b) are exempt regardless of who their clients are because these FAs

16  perform work directly related to the business operations of their employer, *i.e.*, the brokerage firm:

> The registered representatives satisfy the duties requirements of the administrative
> exemption by performing office or non-manual work directly related to the
> management or **general business operations of the employer**, and by performing
> duties that include the exercise of discretion and independent judgment with respect
> to matters of significance.  *See* 29 C.F.R. §§ 541.200(a)(2)-(3); 541.203(b).  Similar
> to the employees discussed in the 2004 preamble in *John Alden*, *Hogan*, and
> *Wilshin* -- all of whom were found to satisfy the duties requirements of the
> administrative exemption -- **the registered representatives service their
> employer's financial services business** by engaging in promotion and business
> development activities, including the marketing, servicing, and promoting of the
> employing firm's financial services and products, and by making themselves
> visible to the appropriate segments of the public in order to meet and retain
> potential new clients for their employing firm.

24  2006 DOL Opinion Letter at *5.  The identity of the FA's clients is irrelevant.

25          Once again, the DOL did not withdraw its 2006 Opinion Letter finding FAs exempt.  To

26  the contrary, the DOL's Administrative Interpretation relied heavily on *Pontius v. Delta Fin.*

27  _____

28  865, 870-72 (7th Cir. 2008) (concluding that this dichotomy is an antiquated approach that is no
   longer helpful in assessing new economy positions in the "modern service industry context").

1  *Corp.*, 2007 WL 1496692, at \*9 and n.20 (W.D. Pa. Mar. 20, 2007) (adopted by *Pontius v. Delta*

2  *Fin. Corp.*, 2007 WL 1412034, at \*1-2 (W.D. Pa. May 10, 2007).  In *Pontius*, the court held that

3  loan officers and mortgage analysts did not qualify for the administrative exemption.  In doing so,

4  however, the *Pontius* court expressly explained why FAs (registered representatives) are

5  nonetheless exempt, as confirmed by the 2006 DOL Opinion Letter covering FAs:

6           the November 27, 2006 Opinion Letter relates to registered stock brokers who must
           uniformly pass qualification/licensing examinations on securities laws, economic

7           and risk theory, portfolio theory/analysis, and taxation.  They are typically retained
           on the basis of their securities-related education and/or expertise.  These employees

8           primarily provide **individual** investment advice to their firm's clients based on
           complex and fluctuating market conditions, **individual** investment portfolio

9           objectives and consequences, tax ramifications, and timing impacts/alternatives.
           Incident to their provision of client investment advice and related portfolio design

10          services, these securities brokers execute stock transactions and market/service the
           brokerage firm's products.") (emphasis added).

11

12  *See id*. at \*7 n.13.  The DOL's 2010 Interpretation relies on *Pontius* and cites to it with approval.

13          In 2015, the DOL issued a notice of proposed changes to the salary minimum for the white

14  collar exemptions as well as potential changes to the duties analysis.  This notice set out a table

15  estimating for certain categories of workers the probability of exempt status under section 13(a) of

16  the FLSA, *i.e.*, the administrative and other white collar exemptions.  *See* 80 Fed. Reg. 38516-01,

17  Appendix A (July 6, 2015).  In Table A-2, the DOL estimated that "Personal Financial

18  Advisor[s]" have a probability of exempt status of 50 to 90 percent.  *See id*. (assigning Code 2).

19  Obviously, if the 2010 guidance had silently changed the exempt status of FAs serving individual

20  clients, then the probability for a "Personal Financial Advisor" would be zero.

21          Current DOL publications are consistent.  The DOL's published FLSA Overtime Security

22  Advisor is "is designed to help employees and employers understand the general application of

23  these [exemption] regulations," and it contains an occupational index that defines a Financial

24  Advisor as someone who "uses knowledge of investments, tax laws, and insurance to recommend

25  financial options to *individuals* in accordance with the individual's short-term and long-term goals

26  (*e.g.*, retirement and estate planning, funding for college, and general investment options)."

27  http://webapps.dol.gov/elaws/whd/flsa/overtime/jobs.htm#F (last visited Nov. 11, 2015) (emphasis

28  added).  That same entry then refers readers to Fact Sheet #17M: Financial Services Industry

1   Employees and the Part 541 Exemptions Under the Fair Labor Standards Act (FLSA), which

2   repeats section 541.203(b) and adds that the application of the administrative exemption "is based

3   on the duties [the employees] perform, not on the identity of the customer they serve."

4   http://www.dol.gov/whd/overtime/fs17m_financial.htm (last visited Nov. 11, 2015).

5        **2.**     **Plaintiff Exercised Discretion by Making Recommendations**

6        In his motion for conditional certification, Plaintiff argues that FAs are admonished that

7   they do not have "discretion" as to the "timing or price of trades."  From this, Plaintiff argues that

8   FAs do not exercise *any* kind of discretion.  (Pl.'s Mot. at 12.)  As set forth in WFA's Opposition

9   to that motion, timing and price "discretion" is a term of art in the industry.  FINRA has

10  established rules around "discretionary" and "non-discretionary" accounts.  FINRA Rules 2510(b)

11  and 2020 and NYSE Rule 408(a) prohibit FAs from making or exercising discretionary trading

12  authority in a customer's account unless the client has authorized the FA to do so.  A client who

13  chooses to provide an FA with "discretionary" authority has authorized the FA to determine the

14  price and timing of transactions for a client, *i.e.*, to effectively trade for the client.  The discretion

15  prong of the administrative exemption is not so demanding, and the DOL has long made clear that

16  FAs exercise sufficient discretion under the exemption by deciding what *recommendations* to give

17  clients, even if they do not have the authority to trade for them.  29 C.F.R. § 541.207(d)(2) (1949)

18  (the exercise of discretion and independent judgment with respect to matters of significance

19  "includes the kind of discretion and independent judgment exercised by a customer's man in a

20  brokerage house in deciding what *recommendations* to make to a customer for the purchase of

21  securities"); 29 C.F.R. § 541.203(b) (confirming that financial services employees are exempt if

22  they advise customers regarding the advantages and disadvantages of different financial products,

23  with no mention of price or timing authority); 2006 DOL Opinion Letter at *6 (because advisors

24  engage in "evaluating the client's individual financial circumstances and investment needs and

25  assessing and comparing the alternatives before making *recommendations* for investment options

26  to the client," they exercise sufficient independent judgment).  The regulations also state: "[t]he

27  decisions made as a result of the exercise of discretion and independent judgment may consist of

28  recommendations for action rather than the actual taking of action."  *See* 29 C.F.R. § 541.202(c).

1    Here, Plaintiff not only admits to performing the tasks in section 541.203(b), but he also

2    concedes that he "compared and evaluated" competing financial products so that he could make a

3    "suitable recommendation" to the client.  (Tsyn Dep. at 50:5-9.)  When making a recommendation

4    to a client, he was "making a judgment" based on his analysis of the client's financial situation

5    and market research.  (*Id*. at 51:5-11.) [9]  Plaintiff dealt primarily with sophisticated instruments

6    (*e.g.*, individual stocks, bonds, exchange-traded funds ("ETFs"), derivatives, annuities, *etc.*).  (*Id*.

7    at 103:1-6; Heinicke Decl. ¶ 1, Ex. A at Dep. Ex. 4 (resume).)  He referred clients to bankers for

8    more basic items (*e.g.*, lines of credit, checking and savings accounts, and mortgages).  (*Id*. at

9    63:20-64:8.)  His book of business consisted of over 500 clients, several dozen of whom had

10   assets over $250,000, and he met with his clients without any direct supervision.  (*Id*. at 87:8-88:3,

11   130:13-20, 131:7-12.)

12       As the Ninth Circuit explained, "[d]iscretion and independent judgment do not necessarily

13   imply that the decisions made by the employee have a 'finality that goes with unlimited authority

14   and complete absence of review.'"  *In re Farmers*, 481 F.3d at 1130 (claims adjustors exercised

15   independent judgment and discretion despite the fact that supervisory approval was needed before

16   the employee could deny a claim) (quoting 29 C.F.R. § 541.202(c)).

17   **V.    CONCLUSION**

18       For the forgoing reasons, WFA respectfully requests that this Court grant this motion.

19   DATED:  November 19, 2015          MUNGER, TOLLES & OLSON LLP

20

21                                      By:      /s/ *Malcolm A. Heinicke*

22                                              MALCOLM A. HEINICKE
                                                Attorneys for Defendant

23

24

25

26   ────────────────────
[9]   The work that Plaintiff describes doing here is the quintessential exercise of requisite

27   discretion and judgment.  *See* 29 C.F.R. § 541.202(a) ("In general, the exercise of discretion and
     independent judgment involves the comparison and the evaluation of possible courses of conduct,

28   and acting or making a decision after the various possibilities have been considered.").