MALCOLM A. HEINICKE (State Bar No. 194174)
malcolm.heinicke@mto.com
MARJA-LIISA OVERBECK (State Bar No. 261707)
mari.overbeck@mto.com
JEFFREY M. OSOFSKY (State Bar No. 268593)
jeff.osofsky@mto.com
MUNGER, TOLLES & OLSON LLP
560 Mission Street
Twenty-Seventh Floor
San Francisco, California 94105-2907
Telephone:      (415) 512-4000
Facsimile:      (415) 512-4077

TERRY E. SANCHEZ (State Bar No. 101318)
terry.sanchez@mto.com
MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue
Thirty-Fifth Floor
Los Angeles, California 90071-1560
Telephone:      (213) 683-9100
Facsimile:      (213) 687-3702

Attorneys for Defendant
WELLS FARGO ADVISORS, LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| VLAD TSYN, DANIEL SILBERMANN, LORI BAGWELL, and CATHERINE HORAN WALKER, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>WELLS FARGO ADVISORS, LLC,<br><br>Defendant. | Case No. 14-cv-02552-LB<br><br>**DEFENDANT WELLS FARGO ADVISORS, LLC'S NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO PLAINTIFF HORAN-WALKER; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Judge:    Hon. Laurel Beeler<br>Date:     January 28, 2016<br>Time:     9:30 a.m.<br>Crtrm.:   C – 15th Floor<br><br>Trial Date:        None Set |

**NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT**

TO THE PARTIES AND THEIR ATTORNEYS OF RECORD:

**PLEASE TAKE NOTICE** that on January 28, 2016 at 9:30 A.M. or as soon thereafter as the matter may be heard, in Courtroom C, 15th Floor, of the Honorable Laurel Beeler of the United States District Court, Northern District of California, 450 Golden Gate Avenue, San Francisco, California 94102, Defendant Wells Fargo Advisors, LLC ("Defendant" or "WFA"), will and hereby does move the Court for partial summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, dismissing Plaintiff Catherine Horan-Walker's individual Second Cause of Action contained in the Third Amended Complaint alleging violations of 29 U.S.C. § 201 *et seq.* WFA brings this motion on the grounds that there is no genuine dispute as to any material fact that Plaintiff Horan-Walker qualifies for the administrative exemption or, in the alternative, the "outside sales" exemption, as a licensed Financial Advisor with WFA. Specifically, Plaintiff's own deposition testimony confirms that her duties qualified her as exempt.

This motion is based on this Notice of Motion and Motion, the attached Memorandum of Points and Authorities, the concurrently filed declaration of Malcolm Heinicke and the exhibits thereto, the pleadings and records on file in this action, and on any additional evidence and arguments that may be presented before or at the hearing of this motion.

DATED:  December 24, 2015                    MUNGER, TOLLES & OLSON LLP


By:      /s/ *Malcolm A. Heinicke*
         MALCOLM A. HEINICKE
         Attorneys for Defendant WELLS FARGO ADVISORS,
         LLC

# TABLE OF CONTENTS

**Page**

MEMORANDUM OF POINTS AND AUTHORITIES ................................................................ 1

I.      INTRODUCTION AND SUMMARY OF ARGUMENT .................................................... 1

II.     PROCEDURAL BACKGROUND ................................................................................. 5

III.    FACTUAL BACKGROUND ....................................................................................... 6

        A.      Plaintiff Is a Well-Educated, Experienced and Licensed Financial Advisor ........... 6

        B.      The "Life Cycle" of Plaintiff's Investment Advice................................................. 7

IV.     ARGUMENT ............................................................................................................ 8

        A.      Plaintiff Satisfies the Administrative Exemption................................................... 8

                1.      Plaintiff is Exempt Because Her Duties Track Those in § 541.203(b) ......... 9

                        (a)     Plaintiff Collects and Analyzes Her Clients' Financial
                                Information ................................................................................... 9

                        (b)     Plaintiff Determines Which Investments Best Suit Her
                                Clients........................................................................................ 10

                        (c)     Plaintiff Advises Her Clients on Advantages and
                                Disadvantages............................................................................. 11

                        (d)     Plaintiff Engages in Marketing and Promotional Work.................. 11

                2.      Plaintiff Spends Most of Her Time on Exempt Duties .............................. 12

                3.      Plaintiff Exercises Discretion and Independent Judgment......................... 13

                4.      This Case Is Strikingly Similar to *Hein* ...................................................... 15

                5.      Plaintiff Cannot Evade the Exemption Because of Individual Clients ....... 19

        B.      In The Alternative, Plaintiff's FLSA Claims Fails As A Matter of Law
                Because She Is An Exempt Outside Salesperson.................................................. 20

                1.      Plaintiff Contends that Her Primary Duty Is Making Sales ....................... 21

                2.      Plaintiff Admitted That She Spends Two To Three Hours Per Week
                        Outside Of Her Bank Branch .................................................................. 21

        C.      Plaintiff Cannot Delay Resolution Under Rule 56(d) Because WFA's
                Motion Is Based Entirely On Plaintiff's Own Admissions. ................................... 23

V.      CONCLUSION ....................................................................................................... 24

DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO PLAINTIFF HORAN-WALKER

# TABLE OF AUTHORITIES

**Page**

**FEDERAL CASES**

*Auer v. Robbins,*
  519 U.S. 452 (1997) ................................................................................2

*Barron v. Lee Enters., Inc.,*
  183 F. Supp. 2d 1077 (C.D. Ill. 2002).................................................24

*D'Este v. Bayer Corp.,*
  2007 WL 6913682 (C.D. Cal. Oct. 9, 2007) ................................5, 23, 24

*In re Farmers Ins. Exch., Claims Representatives' Overtime Pay Litig.,*
  481 F.3d 1119 (9th Cir. 2006)..................................................3, 12, 15, 20

*Hartman v. Prospect Mortg., LLC,*
  11 F. Supp. 3d 597, 604 (E.D. Va. 2014)...............................................22

*Hein v. PNC Fin. Servs. Group, Inc.,*
  511 F. Supp. 2d 563 (E.D. Pa. 2007) ............................................. *passim*

*Pontius v. Delta Fin. Corp.,*
  2007 WL 1412034 (W.D. Pa. May 10, 2007) ........................................20

*Pontius v. Delta Fin. Corp.,*
  2007 WL 1496692 (W.D. Pa. Mar. 20, 2007)........................................20

*Roe-Midgett v. CC Servs., Inc.,*
  512 F.3d 865 (7th Cir. 2008)..................................................................20

*Tatum v. City and Cnty. of San Francisco*
  441 F.3d 1090 (9th Cir. 2006)................................................................23

*Taylor v. Waddell & Reed, Inc.,*
  2012 WL 10669 (S.D. Cal. Jan. 3, 2012) ............................4, 21, 22, 24

*Wolfram v. PHH Corp.,*
  2014 WL 2737990 (S.D. Ohio June 17, 2014)......................................22

*Wong v. HSBC Mortg. Corp. (USA),*
  749 F. Supp. 2d 1009 (N.D. Cal. 2010) .................................................21

**FEDERAL REGULATIONS**

29 C.F.R. ¶ 541.500(b)..................................................................................21

29 C.F.R. § 541.202(c)............................................................................14, 15

DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO PLAINTIFF HORAN-WALKER

29 C.F.R. § 541.203(b) ............................................................................................ 1, passim

29 C.F.R. § 541.205(c)(5) (1949) .......................................................................................1, 8

29 C.F.R. § 541.207(d)(2) (1949) .................................................................................1, 8, 13

29 C.F.R. § 541.500(a) ..................................................................................................4, 21

29 C.F.R. § 541.503(a) .......................................................................................................21

29 C.F.R. § 541.701 ............................................................................................................21

29 CFR § 541.200 ..................................................................................................................8

29 CFR § 541.700(a) .............................................................................................................8

69 Fed. Reg. 22,122, 22,146 (Apr. 23, 2004).............................................................1, 3, 9

**RULES**

FINRA Rule 2090 ...........................................................................................................1, 9

FINRA Rule 2111 .........................................................................................................1, 10

Rule 56(d) ..............................................................................................................5, 23, 24

Rule 56(f) ............................................................................................................................24

**OTHER AUTHORITIES**

Opinion Letter Fair Labor Standards Act, 2006 WL 1094597 (Mar. 31, 2006) ............................22

Opinion Letter Fair Labor Standards Act, 2006 WL 3832994 (Nov. 27, 2006).................2, 3, 9, 14

Opinion Letter Fair Labor Standards Act, 2007 WL 506575 (Jan. 25, 2007) ...........................4, 22

DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO PLAINTIFF HORAN-WALKER

1    <u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

2    **I.       <u>INTRODUCTION AND SUMMARY OF ARGUMENT</u>**

3            Plaintiff Catherine Horan-Walker has worked as a self-described "full service investment

4    advisor" for the past seventeen years.  For the last six of these years, she has worked as a licensed

5    Financial Advisor with Defendant Wells Fargo Advisors, LLC ("Wells Fargo" or "WFA"), where,

6    consistent with decades of regulatory guidance and industry practice, she was classified as an

7    exempt "white collar" employee under the federal Fair Labor Standards Act ("FLSA").[1]  WFA

8    respectfully seeks partial summary judgment on Plaintiff's FLSA claim because (a) Plaintiff

9    herself has testified she performs duties that satisfy the administrative exemption; and (b) even if

10   the administrative exemption does not apply (which it does), Plaintiff's testimony establishes that

11   she is alternatively exempt under the federal outside sales exemption.

12           ***Administrative Exemption***.  For over sixty years, Department of Labor ("DOL")

13   regulations have stated that the administrative exemption covers licensed Financial Advisors

14   ("FAs") who perform the common FA advisory tasks required by securities laws.  *See* 29 C.F.R. §

15   541.205(c)(5) (1949); 29 C.F.R. § 541.207(d)(2) (1949).  In 2004, the DOL confirmed the exempt

16   status of FAs, and issued clarifying regulations stating that financial service employees "generally

17   meet the duties requirements for the administrative exemption" so long as their tasks "include":

18           collecting and analyzing information regarding the customer's income, assets,
             investments or debts; determining which financial products best meet the
19           customer's needs and financial circumstances; advising the customer regarding
             the advantages and disadvantages of different financial products; and marketing,
20           servicing or promoting the employer's financial products.  However, an employee
             whose primary duty is selling financial products does not qualify for the
21           administrative exemption.

22   29 C.F.R. § 541.203(b); 69 Fed. Reg. 22,122, 22,146 (Apr. 23, 2004).  The DOL's decision to

23   specify the tasks in the first sentence as exempt is particularly meaningful because securities rules

24   require Series 7 licensed FAs like Plaintiff to gather financial information on each client and

25   provide suitable investment advice based on that profiling.  *See* FINRA Rules 2090 & 2111.

26   _____

27   [1]    WFA has also filed a motion seeking partial summary judgment on Plaintiff Vlad Tsyn's claim
      for misclassification under the FLSA.  WFA will endeavor not to repeat certain legal points here,
28   and respectfully suggests that this Court review the motion pertaining to Plaintiff Tsyn first.

In 2006, responding to an earlier wave of claims like the one at bar, the DOL issued an Opinion Letter concluding that Series 7 licensed FAs were properly classified as exempt because they performed tasks listed in section 541.203(b) (*i.e.*, gathering client information and making suitable recommendations). *See* Opinion Letter Fair Labor Standards Act (FLSA), 2006 WL 3832994, at *1, *5 (Nov. 27, 2006) ("2006 DOL Opinion Letter"); *see also Auer v. Robbins*, 519 U.S. 452, 459-61 (1997) (reiterating the deference given to DOL Opinion Letters and noting that they are controlling unless "plainly erroneous or inconsistent with the regulation").

Plaintiff Horan-Walker has now provided deposition testimony in which she admits she performs the tasks listed as exempt in section 541.203:

- *Collecting and analyzing information regarding the customer's income, assets, investments or debts* – Plaintiff testified that she has always followed FINRA's "Know Your Client Rule" by reviewing and understanding each client's "financial status and financial needs on an individual basis." Specifically, she confirmed that she works with each client to collect and analyze information on, among other things, the client's income, assets, investments, and debts. (Declaration of Malcolm A. Heinicke ¶ 2, Ex. A ("Horan-Walker Dep.") at 73:18-74:20, 77:15-78:20.)[2]

- *Determining which financial products best meet the customer's needs and financial circumstances* – Plaintiff admitted that FINRA's "Suitability Rule" requires her to make suitable recommendations to her clients. She testified that she provides her clients with "options for different investments," makes "sure that those options are suitable to the specific financial needs of [the] client" and provides the associated advice "directly to the client." Plaintiff testified that she "would forego a transaction rather than recommend a course of action that was not in the best interests or [her] client" because "the most important part of [her] job is making a recommendation that is in the overall bests interests of that client." (*Id.* at 83:22-84:21, 93:2-10.)

- *Advising the customer regarding the advantages and disadvantages of different financial products* – Plaintiff admitted that after she "thoroughly profile[s] each client's financial situation," it is important that she advise the client on the "benefits and features" of the financial options she has presented. Plaintiff admitted that the benefits and features of an investment product are synonymous with "the advantages and disadvantages" of the investment, which she presents to each of her clients. Plaintiff also confirmed that when she "work[s] with a client to

_____

[2] "Horan-Walker Dep." refers to Plaintiff Horan-Walker's deposition transcript, the cited portions of which are attached as Exhibit A to the Declaration of Malcolm Heinicke ("Heinicke Decl.") filed concurrently herewith.

1    help the client understand the risks and advantages of an investment," she prefers to
2    do so in person to ensure "that the client will truly understand those advantages and
     disadvantages."  (Horan-Walker Dep. at 110:7-20, 111:15-112:1.)

3    •    *Marketing, servicing or promoting the employer's financial products* – Plaintiff
4         testified that in addition to advising existing clients, she also "market[s] and
         promote[s] the services and solutions that [she] can provide through Wells Fargo."
5         (*Id.* at 115:9-18.)

6    The Ninth Circuit has held that, when the employee's duties substantially "track" those duties that

7    the DOL has deemed exempt under section 541.203, "that says it all," and the employee is exempt

8    as a matter of law.  *In re Farmers Ins. Exch., Claims Representatives' Overtime Pay Litig.*, 481

9    F.3d 1119, 1124, 1129 (9th Cir. 2006) (finding insurance claim adjustors exempt under another

10   subdivision of section 541.203 and holding that an employee need not perform all of the tasks

11   listed in the section to be exempt under it).

12        Because Plaintiff Horan-Walker cannot dispute the fact that she performs the tasks

13   specified as exempt in section 541.203(b), she will likely contend that because she receives

14   transaction-based incentive compensation and because she is evaluated at least in part on the

15   amount of revenue she generates, all of her various tasks are "sales related," and from this, she

16   will argue her primary duty is sales.  This effort fails for the various reasons set forth in the motion

17   pertaining to Plaintiff Tsyn.  *First*, the 2004 regulations were clarifying regulations that did not

18   alter longstanding guidance stating that registered FAs are exempt.  *Second*, most (if not almost

19   all) financial service employees have customers who eventually place transactions that yield

20   revenue, and the DOL made clear that "many financial services employees qualify as exempt

21   administrative employees, even if they are involved in some selling to consumers."  69 Fed. Reg.

22   22,122, 22,146 (Apr. 23, 2004).  *Third*, in response to an earlier wave of litigation in which

23   plaintiffs asserted the same "sales" argument, the DOL issued an Opinion Letter squarely

24   concluding that licensed FAs generally meet the administrative exemption and do not have a

25   primary duty of selling financial products because they perform these tasks.  *See* 2006 DOL

26   Opinion Letter at *1, *5 (the "description of the duties of these registered representatives suggests

27   that they have a primary duty other than sales, *because* their work includes collecting and

28   analyzing a client's financial information, advising the client about the risks and the advantages

-3-
DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO PLAINTIFF HORAN-WALKER

1   and disadvantages of various investment opportunities . . . and recommending to the client only

2   those securities that are suitable for the client's particular financial status, objectives, risk

3   tolerance, tax exposure, and other investment needs") (emphasis added).

4        In addition, just as Plaintiff Tsyn's pre-litigation resume summarized his primary duty at

5   WFA, Plaintiff Horan-Walker confirmed that her pre-litigation LinkedIn profile accurately

6   summarizes her primary duties.  That profile describes her admitted primary duties as follows:

7        Work with clients one-on-one to discuss values, financial goals and timeline in
    light of their risk tolerance.  Partner with clients to identify solutions that meet their
8   financial needs . . . Help individuals and couples plan for retirement, college
    expenses and wealth transfer.  Develop portfolios which may include stocks, bonds,
9   mutual funds, alternative investments, annuities and insurance.  Offer life, long
    term care, and key man insurance.

10

11  Although her post was subject to compliance review, Plaintiff admitted that it was "all [her]

12  words."  (Horan-Walker Dep. at 117:5-7, 119:9-13, 120:6-8; *see also* Heinicke Decl. ¶ 2, Ex. A at

13  Dep. Ex. 3.)  And, Plaintiff admitted that this profile "accurately summarize[s her] primary duties

14  as a Wells Fargo FA."  (*Id.* at 121:9-11; Dep. Ex. 3.)  Obviously, this posting describes exempt

15  tasks, and it makes no mention of sales whatsoever.

16       ***Outside Sales Exemption***.  Even if the law allowed Plaintiff to avoid summary judgment

17  by merely mislabeling her primary duty as sales (despite her testimony admitting that she actually

18  performed exempt duties), her misclassification claim would still fail as a matter of law under the

19  outside sales exemption.  An outside salesperson is defined as an employee (1) whose "primary

20  duty" is "making sales" or "obtaining orders or contracts for services . . . for which a consideration

21  will be paid by the client or customer," and (2) who "is customarily and regularly engaged away

22  from the employer's place or places of business in performing such primary duty."  29 C.F.R. §

23  541.500(a).  Federal law does impose the temporal requirement contained in California law, and

24  the DOL has confirmed that "selling or sales related activity outside the office 'one or two hours a

25  day, one or two times a week'" (*i.e.*, two to four hours a week) is sufficient.  *Taylor v. Waddell &*

26  *Reed, Inc.*, No. 09-2909, 2012 WL 10669, at *3 (S.D. Cal. Jan. 3, 2012) (quoting Opinion Letter

27  Fair Labor Standards Act (FLSA), 2007 WL 506575, at *3-4 (Jan. 25, 2007) (finding financial

28  advisor exempt as a matter of law and mooting pending request for conditional certification).

-4-

DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO PLAINTIFF HORAN-WALKER

1  Here, Plaintiff Horan-Walker testified that while it varies from week to week, she has over the

2  course of her tenure at WFA spent "two or three hours per week outside of the branch" on sales-

3  related activities, including activities intended to "generate sales."  (Horan-Walker Dep. at 183:1-

4  24.)

5          ***Anticipated Rule 56(d) Request***.  WFA anticipates that Plaintiff will seek to avoid a ruling

6  on the merits of her claim by arguing for more discovery pursuant to Rule 56(d) of the Federal

7  Rules of Civil Procedure.  But, this motion is based on Plaintiff's own testimony.  Her

8  unprecedented claim fails as a matter of law, and further discovery will not (and cannot) change

9  her dispositive admissions.  *See, e.g.*, *D'Este v. Bayer Corp.*, No. 07-3206, 2007 WL 6913682, at

10  *4 n.1 (C.D. Cal. Oct. 9, 2007) (granting early summary judgment in a misclassification case and

11  rejecting the plaintiff's Rule 56(d) request because the summary judgment ruling was "based upon

12  Plaintiff's own description during her deposition of her job duties").

13          In sum, for decades, the entire financial services industry has classified Series 7 FAs as

14  exempt, the DOL has blessed this classification, and no federal court has ever found this

15  classification improper.  To the contrary, federal courts have granted early summary judgment

16  motions against FAs, finding them exempt under both the administrative and outside sales

17  exemptions, and in doing so, these courts have mooted parallel requests for conditional

18  certification.  WFA respectfully requests the same result here.

19  **II.    PROCEDURAL BACKGROUND**

20          Plaintiff Vlad Tsyn filed this case on March 28, 2014, alleging, *inter alia*, that he and

21  WFA FAs throughout the nation are misclassified as exempt employees in violation of the FLSA.

22  On September 24, 2015 Plaintiff Tsyn moved for conditional certification of a national class of

23  FAs in WFA's Wealth Brokerage Services ("WBS") business line, and through a separate

24  pleading, WFA has strenuously opposed such certification.  (ECF No. 68.)

25          After the deadline to amend the complaint had passed, Plaintiff Tsyn sought leave to file a

26  Third Amended Complaint ("TAC").  WFA did not oppose this motion, and Plaintiff Tsyn filed

27  the TAC on October 21, 2015.  The TAC added one additional WBS Plaintiff, Catherine Horan-

28  Walker.  Plaintiff Horan-Walker has not sought conditional certification of her FLSA claims, but

-5-

1   she submitted a declaration in support of Plaintiff Tsyn's conditional certification motion.  (ECF

2   No. 41-3 ¶ 5.)  Plaintiff's declaration provides very little detail about how she actually spends her

3   time, but she admits that she spends time "profiling and meeting with clients and prospective

4   clients . . . creating investment plans . . . estate planning [and] making recommendations."  (*Id.*)

5         After the TAC was filed, WFA sought to depose Plaintiff Horan-Walker, and counsel

6   made her available for deposition in November, just one day before WFA's opposition to Plaintiff

7   Tsyn's conditional certification motion was due.  Plaintiff Horan-Walker testified that she is not

8   aware of any Series 7 licensed FAs in the industry who are classified as non-exempt employees.

9   Plaintiff admitted she has not spoken about this lawsuit to any of the FAs she seeks to represent,

10  and she knows of no other WFA FA who has ever communicated a desire to be treated as an

11  hourly employee.  (Horan-Walker Dep. at 36:21-39:13.)

12  **III.    FACTUAL BACKGROUND**

13        **A.    Plaintiff Is a Well-Educated, Experienced and Licensed Financial Advisor**

14        Plaintiff Horan-Walker is a highly-educated professional: she graduated from Santa Clara

15  University with a Bachelor of Arts in History, and she has a Master's degree in Education from

16  the University of Southern California.  In addition, she earned a Master's of Business

17  Administration Operations and Management (an MBA) from Boston University.  (*Id.* at 16:6-

18  17:18.)  Plaintiff acknowledged that if clients ask about her education, she touts her MBA, and she

19  also references this degree on her public LinkedIn page.  (*Id.* at 18:10-20; *see also* Heinicke Decl.

20  ¶ 3, Ex. B (Plaintiff's public LinkedIn page).)

21        Plaintiff decided to become a licensed financial advisor in 1998.  (*Id.* at 21:16-22.)

22  Plaintiff decided to become an FA because she is "interested in business" and enjoys helping

23  clients with investment decisions by having "conversations with them, uncovering what their

24  values, their goals are, and then discovering what their needs are [and] [f]inding a product that

25  matches their needs and then they can reach their goal, hopefully."  (*Id.* at 22:18-23:25.)  Plaintiff

26  originally worked for Merrill Lynch for three and a half years (*id.* at 22:2-10, 24:19-25:10), and

27  then joined Wells Fargo Investments so that she could "work together" with other advisors "as

28  opposed to being by [herself]."  (*Id.* at 25:25-26:11.)  In 2008, Plaintiff decided to join Wachovia

because she was drawn to its client-focused approach—she was "there to service the client . . . [t]he client came first" and it was important to her to put the interests and needs of her clients first. (Horan-Walker Dep. at 27:21-28:25.)  Shortly after Plaintiff started with Wachovia, it merged with Wells Fargo to become WFA, and Plaintiff stayed on with WFA where "the job has been pretty consistent."  (*Id.* at 29:18-30:19.)

Plaintiff currently holds both a Series 7 and a Series 66 license, and has held both of these licenses for her entire tenure at WFA.  (*Id.* at 57:17-58:8.)  To obtain her Series 7 license, Plaintiff had to pass a six-hour long examination for which she studied for six weeks, every day, including weekends and nights.  The test covered topics such as how to provide suitable financial advice to clients, how to evaluate and understand an individual client's needs, various complex investment alternatives, and account opening procedures.  (*Id.* at 59:7-63:7.)  The Series 7 exam did not cover "topics concerning persuasive salesmanship."  (*Id.* at 62:3-18.)

Plaintiff understands that WFA requires her to follow all of the regulatory obligations imposed by FINRA, including the Know Your Client and Suitability Rules, and that she would be required to follow the rules imposed by FINRA irrespective of where she works for as long as she chooses to work as a registered representative (*i.e.*, as a licensed FA).  (*Id.* at 65:3-17.)  Plaintiff's continuing education requirements necessitate additional "suitability testing."  (*Id.* at 64:3-18.)

On her application to Wells Fargo Investments, Plaintiff characterized her "job duties" at Merrill Lynch as those of a "full service investment advisor."  (*Id.* at 32:8-10, 32:15-33:6; Heinicke Decl. ¶ 2, Ex. A at Dep. Ex. 1.)  Plaintiff has now confirmed that "all of the information" submitted in that application was "accurate."  (*Id.* at 33:3-6.)  And, she has testified that at WFA, she has performed "essentially the same functions" that she performed as an FA at Merrill Lynch (*id.* at 30:14-19).

## B. The "Life Cycle" of Plaintiff's Investment Advice

Plaintiff begins a client relationship and the associated task of "build[ing] an investment plan" by "profiling the client" to understand the client's "values" and their "goals for [their] money," "timeline" and "risk tolerance."  (*Id.* at 161:5-21.)  Then, based on the answers her clients provide, Plaintiff looks at what is "the best match for them to accomplish the goals that they are

1  trying to achieve," which then results in the "initial investment plan and the initial investment

2  recommendation."  (Horan-Walker Dep. at 162:1-8.)  In doing so, Plaintiff does her best to work

3  with clients "to assess the risks that they face and mitigate them."  (*Id.* at 163:21-164:11.)

4        Plaintiff admitted that the "process of profiling the client and understanding the client's

5  needs is an ongoing process that continues for the life of the relationship" "[b]ecause people are

6  constantly changing" and "it is important for [Plaintiff] to be informed of all those developments."

7  (*Id.* at 164:12-20.)  Plaintiff currently advises 390 different clients, and 69 of them are "high net

8  worth households," meaning they have more than $250,000 in investable assets.  (*Id.* at 157:24-

9  159:2.)

10  **IV.**    <u>**ARGUMENT**</u>

11      **A.**    <u>**Plaintiff Satisfies the Administrative Exemption**</u>

12        To establish the administrative exemption, an employer need only show that a salaried

13  employee's primary duty (a) was the "performance of office or non-manual work directly related

14  to the management or general business operations of the employer or the employer's customers";

15  and (b) "include[d] the exercise of discretion and independent judgment with respect to matters of

16  significance."  *See* 29 CFR § 541.200(a)(2), (3).[3]  "Determination of an employee's primary duty

17  must be based on all the facts in a particular case, with the major emphasis on the character of the

18  employee's job as a whole."  29 CFR § 541.700(a).

19        The history of the pertinent DOL regulations is set forth in WFA's motion for partial

20  summary judgment on Plaintiff Tsyn, and WFA will simply summarize that history here.  Since

21  the inception of the regulations in the 1940s, the DOL has made clear that registered

22  representatives satisfy both duties prongs of the administrative exemption test.  *See* 29 C.F.R. §

23  541.205(c)(5) (1949); 29 C.F.R. § 541.207(d)(2) (1949); 29 C.F.R. § 541.205(c)(5) (1973); 29

24  C.F.R. § 541.207(d)(2) (1973).  The 2004 clarifying regulations confirm that financial services

25  ─────────────────────

26  [3]   In addition to the "primary duty" test, the administrative exemption requires that the employee be compensated "on a salary or fee basis at a rate of not less than $455 per week."  29 CFR §

27  541.200(a)(1).  Plaintiff cannot dispute that she was paid on a salary basis.  She admitted that she has always received a set draw payment regardless of her incentive compensation or hours

28  worked.  (Horan-Walker Dep. at 40:16-41:12.)

employees "generally meet the duties requirements for the administrative exemption" so long as their duties merely "include" tasks such as collecting and analyzing information regarding a customer's income, assets, investments or debts; determining which financial products best meet the customer's needs and financial circumstances; advising the customer regarding the advantages and disadvantages of different financial products; and marketing, servicing or promoting the employer's financial products.  29 C.F.R. § 541.203(b); *see also* 69 Fed. Reg. 22122, 22145-46 (confirming that these are exempt duties consistent with the decades of regulations stating that registered representatives are exempt).  Consistent with this guidance, in the 2006 Opinion Letter, the DOL concluded that financial representatives who are licensed with NASD/FINRA and who perform such duties generally satisfy the administrative exemption *even if* they "also bring about the purchase or sale of such investments for their clients and execute the actual transactions that result from their financial advice."  *See* 2006 DOL Opinion Letter at *2.

In sum, decades of DOL regulatory guidance has made clear that performing the tasks deemed exempt in section 541.203(b) renders an FA exempt, even though the performance of these tasks culminates in or otherwise relates to a transaction or sale.  Plaintiff's testimony establishes not only that she performs the tasks specified as exempt in 29 C.F.R. § 541.203(b), but that she in fact performs all of them and that she spends a majority of her time on these tasks.

      **1.**        **Plaintiff is Exempt Because Her Duties Track Those in § 541.203(b)**

      *(a)*        *Plaintiff Collects and Analyzes Her Clients' Financial Information*

Plaintiff admits that as a WFA FA, she collects and analyzes customer financial information.  Specifically, Plaintiff admitted that, as a registered representative, she is required to and does in fact follow FINRA's "Know Your Customer" rule, which was created by regulation to protect the investing public.  (Horan-Walker Dep. at 73:18-74:20; *see also* FINRA Rule 2090 ("Every member shall use reasonable diligence, in regard to the opening and maintenance of every account, to know (and retain) the essential facts concerning every customer and concerning the authority of each person acting on behalf of such customer").)

As Plaintiff explained, the Know Your Customer Rule means "understanding each individual client's financial situation" before working with them, *i.e.*, by "reviewing their financial

-9-

1   status and financial needs on an individual basis." (Horan-Walker Dep. at 73:18-74:17.)  Plaintiff

2   admitted that she takes time to understand the financial goals and needs of each of her clients (*id.*

3   at 74:21-24) and that in the client profiling process, she does the following, among other things:

4   •   "collect and analyze information on the client's income" (*id.* at 77:18-20);

5   •   "collect and analyze information on the client's assets" (*id.* at 77:15-17);

6   •   "collect and analyze information on the client's investments" (*id.* at 78:2-4); and,

7   •   "collect and analyze information on the client's debts" (*id.* at 78:18-20).

8   Plaintiff admitted that the purpose of this profiling process "is to obtain a complete

9   financial picture of the client" (*id.* at 79:22-24) and that this process is "ongoing" over the course

10  of the client relationship, requiring her to "constantly" fill in gaps in a client's financial data,

11  which she does even if clients resist because it is important "to make sure that their needs or

12  objectives haven't changed." (*Id.* at 82:5-83:21 (testifying that it is important to keep a client's

13  financial profile up to date because it is her responsibility to ensure that the client's investments

14  "are still suitable to their needs").)  Moreover, Plaintiff conceded that she has never advised a

15  client to buy or sell an investment during an "initial call or meeting without having profiled the

16  client and without the associated knowledge of that client's finances or goals." (*Id.* at 85:2-7.)

17  *(b)*   *Plaintiff Determines Which Investments Best Suit Her Clients*

18  Plaintiff admits that she has always abided by FINRA's "Suitability Rule," which requires,

19  in part, that a registered representative "have a reasonable basis to believe that a recommended

20  transaction or investment strategy involving a security or securities is suitable for the customer,

21  based on the information obtained through the [profiling process]."  FINRA Rule 2111.  Plaintiff

22  acknowledged that this obligation prevents her and other registered representatives "from advising

23  a customer to go into an investment that isn't suitable for [the] client," and so she must

24  "understand each individual client's financial situation and investment profile" before

25  recommending an investment product. (Horan-Walker Dep. at 75:6-76:3.)

26  Plaintiff testified that she has "always been diligent to collect and analyze the data for each

27  client so [she] can make suitable recommendations." (*Id.* at 76:19-77:8.)  She further testified that

28  she provides her clients with "options for different investments," making "sure that those options

-10-

1    are suitable to the specific financial needs of [the] client" before providing the associated advice

2    "directly to the client."  (Horan-Walker Dep. at 84:3-21.)  By way of example, Plaintiff testified

3    that she considers options (such as puts and calls) to be a "risky investment," and so she would not

4    usually advise her clients to go into options, "[u]nless they are an aggressive investor" and the

5    vehicle "matches their risk tolerance."  (*Id.*  at  60:6-61:21.)

6         Summarizing her approach to her clients, Plaintiff testified that she would rather forego a

7    transaction "than recommend a course of action that was not in the best interests or [her] client"

8    because "the most important part of [her] job is making a recommendation that is in the overall

9    bests interests of that client."  (*Id.* at 93:2-10.)

10              *(c)     Plaintiff Advises Her Clients on Advantages and Disadvantages*

11        Plaintiff testified that after she has used her judgment to narrow down the suitable

12   investment options for her clients, she ensures that the client "understands the potential

13   disadvantages or potential risks" of the investment options, as well as the "potential advantages."

14   (*Id.* at 88:21-89:20.)  Plaintiff prefers to meet with her clients in person to discuss the advantages

15   and disadvantages of her investment advice "because it is more personal and ensures that the client

16   will truly understand those advantages and disadvantages."  (*Id.* at 111:15-112:1.)  Plaintiff

17   testified that providing her clients with the advantages and disadvantages of different investment

18   options provides her clients with knowledge, which helps them "make better decisions."  (*Id.* at

19   112:2-12.)  Doing so also helps Plaintiff retain her clients because, as she testified, "retaining

20   clients happens when [she] is looking out for their best interests."  (*Id.* at 112:10-21.)  Plaintiff's

21   LinkedIn profile sums up the point:  "I am part *educator*, part detective and part *counselor* and

22   help clients assess their tolerance for risk, build their confidence as they build their portfolio, and

23   ultimately, achieve their financial goals . . . I am a firm believer that when I *educate* clients about

24   money they make smarter financial decisions.  My motto is 'if you don't understand it, you can't

25   have it.'"  (Heinicke Decl. ¶ 3, Ex. B (emphasis added).)

26              *(d)     Plaintiff Engages in Marketing and Promotional Work*

27        Plaintiff admitted that in addition to working on investments with existing clients, she also

28   "market[s] and promote[s] the services and solutions that [she] can provide through Wells Fargo."

-11-

DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO PLAINTIFF HORAN-WALKER

1   (Horan-Walker Dep. at 115:9-18.)  Plaintiff admitted that the purpose of her LinkedIn profile is to

2   make herself "visible to the segments of the public who may want to invest through Wells Fargo"

3   (*id.* at 116:19-117:4), and that she does "a lot of things in the branch so that [she has] visibility" to

4   her banking partners who refer clients to her.  (*Id.* at 134:7-14.)  Plaintiff has never engaged in

5   cold calling prospective clients.  (*Id.* at 122:14-19.)

6        Because Plaintiff's admitted job functions mirror each of the exempt duties delineated in

7   section 541.203(b), she is exempt as a matter of law under both prongs of the primary duty test.

8   *See In re Farmers*, 481 F.3d at 1124, 1129 (holding that when the employee's duties substantially

9   "track" duties that the DOL has deemed exempt in section 541.203, "that says it all," and the

10  employee is exempt as a matter of law).

## 2.    Plaintiff Spends Most of Her Time on Exempt Duties

12       Plaintiff testified that, as a WFA FA, she spends the majority of her time on exempt duties:

13  - <u>Forty percent meeting with clients</u>. Plaintiff testified that she spends 40% of her
       time in meetings with clients in which she is undertaking financial "profiling" of
14     the clients, making "recommendations to them that are suitable to them," advising
       them on the "benefits and features" of investment options and otherwise following
15     the Know Your Client and Suitability Rules.  (Horan-Walker Dep. at 135:5-136:4.)

16  - <u>Twenty percent on investment research</u>.  Plaintiff testified that she receives large
17     volumes of "investment research" and that she estimates that she spends 20% of her
       time "distilling" investment research "[b]ecause it is important" to her job.  (*Id.* at
18     90:1-13,130:14-25.)

19  - <u>Fifteen percent preparing investment plans</u>.  Plaintiff testified that she spends 15%
20     of her time "preparing investment plans."  (*Id.* at 132:4-7.)

21  - <u>Ten percent promoting her services</u>.  Plaintiff testified that she spends 10% of her
22     time "promot[ing her] services to attract new clients."  (*Id.* at 133:15-134:17.)

23  - <u>Fifteen percent completing required paperwork</u>.  Plaintiff testified that the
       remaining fifteen percent of her time is spent on phone calls, opening accounts,
24     placing orders and completing the paperwork associated with client transactions.
       (*Id.* at 136:15-137:20.)  Notably, Plaintiff testified that she has, at times, had an
25     assistant to whom she delegated certain tasks, which allowed her to "focus more
       time on advising [her] clients."  (*Id.* at 52:8-53:1.)

26

27

28

1  The exempt duties performed by Plaintiff are also manifest on her publically-available LinkedIn

2  profile, which Plaintiff admitted "accurately summarize[s her] primary duties as a WFA FA."

3  (Horan-Walker Dep. at 120:6 -121:11.)  Her LinkedIn profile states:

4       I am a Financial Advisor with Wells Fargo Advisors and bring more than 17 years
         of investment planning experience to my clients. I am part educator, part detective
5        and part counselor and help clients assess their tolerance for risk, build their
         confidence as they build their portfolio, and ultimately, achieve their financial
6        goals.  My motto is "if you don't understand it, you can't have it." I am a firm
         believer that when I educate clients about money they make smarter financial
7        decisions.  My clients count on my knowledge . . . and know that I offer financial
         solutions that allow them to sleep soundly.

8

9  (Heinicke Decl. ¶ 3, Ex. B; *see also* Horan-Walker Dep. at 119:9-13, 120:6-8; Heinicke Decl. ¶ 2,

10  Ex. A at Dep. Ex. 3.)  When summarizing her position as an FA in the resume portion of her

11  profile, Plaintiff states:

12       Work with clients one-on-one to discuss values, financial goals and timeline in
         light of their risk tolerance.  Partner with clients to identify solutions that meet their
13       financial needs . . . Help individuals and couples plan for retirement, college
         expenses and wealth transfer.  Develop portfolios which may include stocks, bonds,
14       mutual funds, alternative investments, annuities and insurance.  Offer life, long
         term care, and key man insurance.

15

16  (*Id.*)  Plaintiff also testified that she worked with someone at "Who's Who" on a profile of her

17  work, and she confirmed that this profile also "accurately describes [her] main duties at Wells

18  Fargo as an FA."  (Horan-Walker Dep. at 128:1-3, 129:5-130:4; Heinicke Decl. ¶ 2, Ex. A at Dep.

19  Ex. 5.)  That profile states:

20       With 16 years of experience in the industry and five years in her current role, Ms.
         Horan-Walker handles a multitude of financial products, including financial
21       planning, investments, and insurance and long-term care planning.  She is meeting
         with clients, listening to their concerns, explaining the options, making
22       recommendations and deciding on a course of action.

23  (*Id.*)  In short, Plaintiff has admitted that these are her primary or main duties.

24          **3.      Plaintiff Exercises Discretion and Independent Judgment**

25          The DOL has long made clear that FAs exercise sufficient discretion under the exemption

26  by deciding what *recommendations* to give clients, even if they do not have the authority to trade

27  for them.  29 C.F.R. § 541.207(d)(2) (1949) (the exercise of discretion and independent judgment

28  with respect to matters of significance "includes the kind of discretion and independent judgment

-13-

1    exercised by a customer's man in a brokerage house in deciding what *recommendations* to make

2    to a customer for the purchase of securities"); 29 C.F.R. § 541.203(b) (confirming that financial

3    services employees are exempt if they advise customers regarding the advantages and

4    disadvantages of different financial products, with no mention of price or timing authority); 2006

5    DOL Opinion Letter at *6 (because advisors engage in "evaluating the client's individual financial

6    circumstances and investment needs and assessing and comparing the alternatives before making

7    *recommendations* for investment options to the client," they exercise sufficient independent

8    judgment).  The regulations also state: "[t]he decisions made as a result of the exercise of

9    discretion and independent judgment may consist of recommendations for action rather than the

10   actual taking of action."  *See* 29 C.F.R. § 541.202(c).

11          Here, Plaintiff not only admits to performing the tasks in section 541.203(b), but she also

12   concedes that she provides her clients with "options for different investments" and makes sure that

13   those options "are suitable to the specific financial needs of [the] client."  (Horan-Walker Dep. at

14   84:3-21.)  When making a recommendation to a client, she is "educating" the client based on her

15   analysis of the client's financial situation and market research.  (*Id.* at 76:19-77:8, 85:23-86:8,

16   112:2-12.)  In this process of selecting and recommending suitable investment options for the

17   client, Plaintiff testified that she has "access to thousands of different types of investments" and

18   that WFA's system is an "open architecture," meaning that when offering investment solutions,

19   FAs like Plaintiff can "do whatever [they] want" whether those investment options are "on or off

20   the Wells Fargo platform."  (*Id.* at 87:24-88:20.)

21          Plaintiff admits that (1) she has the discretion not to accept a client if she does not think the

22   relationship would be a good fit or otherwise does not want to take on that client (*id.* at 80:19-21);

23   (2) the final decision about which investment options to put before a client is not "made by an

24   algorithm, or a computer, or Wells Fargo," but instead, "is a decision that Catherine Horan-Walker

25   makes in her discretion using all of the information she has before her" (*id.* at  91:22-92:21); and

26   (3) her supervisors never sit in on her client meetings or listen to her client telephone calls, nor do

27   they ever "review the investment plans that [she] created for [her] clients."  (*Id.* at 152:11-24.)

28

-14-

DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO PLAINTIFF HORAN-WALKER

1    WFA anticipates Plaintiff will argue that she lacked the ability to exercise judgment and

2    discretion because her investment recommendations were subject to regulatory oversight.  Of

3    course, this is true of all registered representatives as the result of securities industry regulations,

4    but for decades, the DOL has stated that such employees are exempt.  Moreover, Plaintiff admitted

5    that none of her proposed client transactions has ever been disallowed (Horan-Walker Dep. at

6    154:5-13), that she communicates with the Wells Fargo Compliance Department only "once a

7    month"  (*id.* at 157:15-23), and that of all of her client transactions, only "about twenty" percent

8    have required management review, and in none of those instances has Wells Fargo ever changed

9    the "investment recommendation" that Plaintiff provided her client.  (*Id.* at 101:25-102:17, 106:9-

10   18, 109:11-14.)  As the Ninth Circuit explained, "[d]iscretion and independent judgment do not

11   necessarily imply that the decisions made by the employee have a 'finality that goes with

12   unlimited authority and complete absence of review.'"  *In re Farmers*, 481 F.3d at 1130 (claims

13   adjustors exercised independent judgment and discretion despite the fact that supervisory approval

14   was needed before the employee could deny a claim) (quoting 29 C.F.R. § 541.202(c)).

15                    **4.         This Case Is Strikingly Similar to *Hein***

16           In *Hein v. PNC Fin. Servs. Group, Inc.*, 511 F. Supp. 2d 563 (E.D. Pa. 2007), the court

17   granted summary judgment against an individual financial advisor on the basis of his own

18   deposition testimony, which revealed that he was properly classified as exempt.  In doing so, the

19   court mooted the plaintiff's request for conditional certification of a national class.  The

20   similarities between *Hein* and the facts here are striking:

21           The *Hein* Case:  Plaintiff Hein held a Series 7 (general securities representative) and Series

22   63 (state license) and was a "licensed insurance agent (enabling the holder to sell certain insurance

23   products)."  *Hein*, 511 F. Supp. 2d at 566.  Before joining PNC (the defendant brokerage firm in

24   that case), Plaintiff Hein "had worked in the financial industry for approximately twenty years."

25   *Id.*  Plaintiff Hein "sought a position at PNC in response to an advertisement that described PNC

26   as a 'premier brokerage firm with a sales culture based on client needs rather than product-

27   oriented selling."  *Id.*

28

-15-

1      The Case at Bar:  Plaintiff Horan-Walker has held Series 7 and Series 66 licenses with

2   NASD and FINRA since the start of her seventeen-year career as a financial advisor, and she has

3   held those licenses over her entire tenure at WFA.  (Horan-Walker Dep. at 57:17-58:8.)  Plaintiff

4   also testified that she has another license that "allows [her] to advise clients on insurance within

5   California."  (*Id.* at 68:21-69:13.)  Plaintiff admits that in this process, she will work to

6   "understand [the client's] individualized needs," "work with the insurance department to match an

7   insurance product to the needs of [her] client" and then work with the client "to explain the

8   advantages and disadvantages of the different insurance products."  (*Id.* at 70:6-72:11, 73:15-17.)

9   Plaintiff admitted that what attracted her to Wachovia, which ultimately merged into WFA, was

10  that the company and her supervisor made clear the "client came first," and she liked this because

11  it is important to "put the interests and needs of [her] client's first."  (*Id.* at 27:21-28:25.)

12     The *Hein* Case:  Plaintiff Hein managed 200 client accounts worth an aggregate amount of

13  $25 million to $30 million, and most of his clients were existing PNC clients, although he brought

14  approximately 25% of his clients from his former firm.  *Hein*, 511 F. Supp. 2d at 566.  Plaintiff

15  Hein "received commissions on his sales of investment products, with a guaranteed bi-weekly

16  draw."  *Id.*  "Thus, although his monthly income varied with his sales revenue, it was never less

17  than" the draw amount.  *Id.*  In the pertinent timeframe, PNC financial advisors in the same

18  position as Plaintiff Hein "had an average annual income of over $100,000."  *Id.*

19     The Case at Bar:  Plaintiff Horan-Walker testified that she "currently advise[s]" 390

20  different clients.  69 of these accounts are "high net worth households" meaning they "have more

21  than $250,000 in investable assets," and approximately forty percent have more than $100,000 in

22  investable assets.  (Horan-Walker Dep. at 157:24-159:2.)  In other words, Plaintiff has

23  approximately 200 clients that together represent *at least* $25 million in investable assets and

24  likely much more.

25     Plaintiff testified that several of her clients have followed her during her various moves,

26  and about "15 percent" of her clients have been with her since she left WFI in 2008.  (*Id.* at 115:3-

27  8.)  Plaintiff admitted that over the course of her entire tenure at WFA, she received both draw and

28  incentive compensation, and her draw was "set," paid every pay period, and never reduced

DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO PLAINTIFF HORAN-WALKER

1    regardless of how much incentive compensation was earned or how many hours she worked.

2    (Horan-Walker Dep. at 40:16-41:12.)  As set forth in the WFA's opposition to the motion for

3    conditional certification, the average annual compensation of WBS FA nationwide is

4    approximately $190,000 (ECF No. 68-1, Ex. N).

5        The *Hein* Case:  Plaintiff Hein "sold myriad financial instruments, including securities,

6    stocks, bonds, mutual funds, variable annuities, fixed annuities, life insurance, and long-term care

7    insurance."  *Hein*, 511 F. Supp. 2d at 566-67.  "He directly processed most of these transactions

8    either by telephone or computer."  *Id.*  Plaintiff Hein "researched and sold products from an

9    approved list provided by PNC."  *Id.*  "Very few of these products were actually owned by PNC."

10   *Id.*  Plaintiff Hein's sales portfolio was limited to the "sophisticated investment instruments"

11   described above, and "he did not sell checking or savings accounts, money market accounts,

12   certificates of deposit, PNC loans, or lines of credit."  *Id.*

13       The Case at Bar:  Plaintiff Horan-Walker admitted that in the process of selecting suitable

14   investment options for her clients, she has "access to thousands of different types of investments"

15   and because the system is an "open architecture," FAs like Plaintiff can "do whatever we want" as

16   far as presenting investment options even if those investment options are "off the Wells Fargo

17   platform."  (Horan-Walker Dep. at 87:24-88:20.)  She further testified that the "myriad of

18   investment options" available to her to recommend to her clients include "stocks," "bonds,"

19   approximately "15,000 … mutual funds," "retirement funds or IRAs" and "college savings plans,"

20   and "far less than five percent of the options available to [her] are Wells Fargo proprietary

21   investments."  (*Id.* at 93:11-94:22.)  Plaintiff testified that although she works with clients on

22   stocks and bonds, she does not assist them with "less sophisticated solution[s]" such as a

23   "checking or savings account," "a line of credit," or "a home loan," and would instead refer such

24   items to "someone within the bank or another appropriate resource."  (*Id.* at 109:15-110:6.)

25       The *Hein* Case:  The court concluded that Plaintiff Hein's "supervision was minimal"

26   because (a) he had a manager whom he saw "no more than twice a month" at meetings, (b) he

27   "communicated with the manager by phone or email five to eight times a month," and (c) the

28   "manager did not observe Mr. Hein's meetings with clients, listen to Mr. Hein's phone

-17-

DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO PLAINTIFF HORAN-WALKER

1  conversations with clients, monitor Mr. Hein's job performance, or actively train Mr. Hein."

2  *Hein*, 511 F. Supp. 2d at 567.

3     The Case at Bar:  Plaintiff Horan-Walker has had four different Regional Branch Managers

4  (RBMs) serve as her direct supervisor.  All worked in offices one to several hours away, and on

5  average (a) Plaintiff met with her supervisor in person only once every one to two months, and the

6  meetings lasted "one hour or a little bit more" if it was a group meeting; (b) Plaintiff spoke with

7  her supervisor only "about once a week" on the telephone with the conversation lasting five to ten

8  minutes for three of the supervisors and thirty minutes for one; and (c) Plaintiff's supervisors

9  never sat in on Plaintiff's client meetings or listened to Plaintiff's client telephone calls, nor did

10 they ever "review the investment plans that [she] created for [her] clients."  (Horan-Walker Dep.

11 at 151:13-152:24.)

12    The *Hein* Case:  Plaintiff Hein spent "approximately fifty percent of his time 'cold-

13 calling'" potential clients.  *Hein*, 511 F. Supp. 2d at 573.  Once he connected with the targeted

14 client, he "introduced himself and PNC, inquired about the client's financial goals and needs,

15 asked about the client's assets and investments, and tried to persuade the client to come to the

16 bank for a meeting."  *Id.* at 568.  "He never advised a client to buy or sell an investment on an

17 initial call, as it would have been inappropriate to do so without knowing more about the client's

18 resources and goals."  *Id.*

19    The Case at Bar:  Plaintiff Horan-Walker was never required to engage in any cold-calling.

20 (Horan-Walker Dep. at 122:14-19.)  Plaintiff begins the life cycle of a client relationship and the

21 associated task of "build[ing] an investment plan" by "profiling the client" to understand the

22 client's "values" and their "goals for [their] money," "timeline" and "risk tolerance."  (*Id.* at

23 161:5-21.)  Plaintiff admitted that she has never advised a client to buy or sell an investment

24 during an "initial call or meeting without having profiled the client and without the associated

25 knowledge of that client's finances or goals."  (*Id.* at 85:2-7.)

26    The *Hein* Case:  Finally, in *Hein*, the court summarized the plaintiff's duties as follows:

27        [Plaintiff] engaged in six principal tasks: researching the performance of particular
          financial instruments; learning his clients' assets, holdings, and investment aims;
28        recommending investments appropriate to the individual client; implementing

-18-

1
2
3
4
5

actual transactions; generating new sales leads; and supervising [his sales consultants.]  In carrying out these tasks, Mr. Hein had two goals: to make a recommendation that would best suit the client's needs, and to make a sale for PNC and a commission for himself.  His compensation depended largely on his clients' actual sales or purchases. Mr. Hein testified that although both he and PNC profited from his sales, and regarded high sales volume as important and desirable, the most important thing he did was to advise the client on the best thing for the client.  As an ethical consultant who worked for a reputable financial institution, he would have forgone a sale rather than recommend a course of action that was not in the client's best interest.

6

7  *Hein*, 511 F. Supp. 2d at 569 (internal citations omitted).

8          <u>The Case at Bar</u>:  Plaintiff Horan-Walker engaged in the following duties:  20% of her

9  time "distilling" investment research; 40% of her time on meetings with clients in which she is

10 undertaking financial "profiling" of the clients, making "recommendations to them that are

11 suitable to them," and "advising them" on the "benefits and features" of investment options; 15%

12 of her time "preparing investment plans"; 15% of her time on phone calls, opening accounts,

13 placing orders and completing the paperwork associated with client transactions; and 10% of her

14 time "promot[ing her] services to attract new clients."  (Horan-Walker Dep. at 90:1-13, 130:14-25,

15 135:5-136:4, 132:4-7, 133:15-134:17, and 136:15-137:20.)  Although she was paid in part through

16 incentive compensation, Plaintiff confirmed that she would never let her own compensation

17 influence her client advice because "advancing the best interests of the client is the most important

18 part of [her] job."  (*Id.* at 47:22-48:3.)  Similarly, Plaintiff testified that she "would forego a

19 transaction rather than recommend a course of action that was not in the best interests of [her]

20 client" because "the most important part of [her] job is making a recommendation that in the

21 overall bests interests of that client."  (*Id.* at 93:2-10.)

22          In sum, the parallels between the cases are striking.  If anything, Plaintiff Hein's case was

23 a closer call because he spent so much time on cold-calling, but the court concluded he was

24 exempt as a matter of law on summary judgment because he conceded in his testimony that he

25 performed same job functions that Plaintiff Horan-Walker has clearly admitted she performs.

26          **5.       Plaintiff Cannot Evade the Exemption Because of Individual Clients**

27          Unable to distinguish the DOL Opinion Letter and earlier guidance actually addressing

28 financial advisors, Plaintiff may rely on an "Administrative Interpretation" issued by the DOL in

-19-

1   2010 suggesting that mortgage brokers who provide their company's loans to individuals are not

2   exempt.  *See* DOL Administrator's Interpretation, 2010 WL 1822423, at *9, (Mar. 24, 2010).  As

3   stated in WFA's motion regarding Plaintiff Tsyn, this 2010 Administrative Interpretation did not

4   change the DOL's clear guidance on licensed financial advisors.  The DOL did not reverse the

5   decades of actual regulations stating the registered representatives are exempt, and it did not

6   withdraw its 2006 Opinion Letter reaching the same conclusion.  In fact, the DOL's

7   Administrative Interpretation relied heavily on *Pontius v. Delta Fin. Corp.*, 2007 WL 1496692, at

8   *9 and n.20 (W.D. Pa. Mar. 20, 2007) (adopted by *Pontius v. Delta Fin. Corp.*, 2007 WL

9   1412034, at *1-2 (W.D. Pa. May 10, 2007).  In *Pontius*, the court found that loan officers and

10  mortgage analysts did not qualify for the administrative exemption, and it distinguished the 2006

11  Opinion Letter and expressly explained why FAs (registered representatives) are exempt.  *Id.* at *7

12  n.13.[4]

13          B.      **In The Alternative, Plaintiff's FLSA Claims Fails As A Matter of Law Because**
14                  **She Is An Exempt Outside Salesperson**

15          Even if Plaintiff Horan-Walker could somehow evade the exempt administrative employee

16  (and she cannot), her FLSA claim would still fail under the outside salesperson exemption.  An

17  outside salesperson is an employee (1) whose "primary duty" is "making sales" or "obtaining

18  orders or contracts for services . . . for which a consideration will be paid by the client or

19  customer," and (2) who "is customarily and regularly engaged away from the employer's place or

20

21  [4]     It should be noted that 2010 Interpretation suggested that mortgage brokers were non-exempt
22  salespersons by applying the "administrative/production dichotomy."  The Ninth Circuit in *In re*
    *Farmers* expressly rejected the plaintiffs' production/administrative argument and held that the
23  claims adjustors there were exempt because they performed the duties listed in section 541.203 as
    exempt.  *In re Farmers*, 481 F.3d at 1131-32; *see also Roe-Midgett v. CC Servs., Inc.*, 512 F.3d
24  865, 870-72 (7th Cir. 2008) (concluding that this dichotomy is an antiquated approach that is no
    longer helpful in assessing new economy positions in the "modern service industry context").
25  Furthermore, even if this antiquated construct was still a proper way to analyze positions for
    which there was no clear guidance, there would be no need to resort to it here because the DOL
26  has squarely stated that financial advisors that perform the duties to which Plaintiffs here have
    admitted are exempt.

27

28

1  places of business in performing such primary duty."  29 C.F.R. § 541.500(a).  "Importantly, the

2  FLSA exemption includes not only the sales work itself, but also any 'work performed incidental

3  to and in conjunction with the employee's own outside sales or solicitations.'"  *Taylor*, 2012 WL

4  10669, at *3 (quoting 29 C.F.R. ¶ 541.500(b)); *see also Wong v. HSBC Mortg. Corp. (USA)*, 749

5  F. Supp. 2d 1009, 1013 (N.D. Cal. 2010) (finding that making a sale "is not an activity that

6  necessarily occurs at one time and/or in one location, but, rather, may comprise a number of

7  component activities"); 29 C.F.R. § 541.503(a) ("promotional work that is actually performed

8  incidental to and in conjunction with an employee's own outside sales or solicitations is exempt

9  work." ).

10  **1.      Plaintiff Contends that Her Primary Duty Is Making Sales**

11      Plaintiff Horan-Walker pled in the TAC that she was primarily engaged in sales.  (*See* ECF

12  No. 58 ¶ 27 ("Plaintiffs . . . were primarily engaged in sales of financial products to individuals");

13  *id.* ¶¶ 35, 46, 50 (". . . [Plaintiffs] are/were primarily engaged in sales and sales related activities

14  . . .").)  Plaintiff and her counsel have no doubt made this allegation to circumvent the

15  administrative exemption that has applied to licensed financial advisors for decades, but having

16  now made this allegation, they cannot deny this position for purposes of the alternative analysis of

17  the sales exemption.  Indeed, in response to her counsel's leading questions, Plaintiff testified that

18  all of the tasks she performs are "sales related" and that there are no activities that she

19  "customarily and regularly perform[s] [that are] not somehow related to [her] sales efforts."

20  (Horan-Walker Dep. at 218:6-14.)  Accordingly, the alternative outside sales analysis turns on

21  whether Plaintiff "customarily and regularly" engaged in sales or sales-related activities away

22  from her office.

23  **2.      Plaintiff Admitted That She Spends Two To Three Hours Per Week**
           **Outside Of Her Bank Branch**

24

25      The phrase "customarily and regularly"  means a frequency that must be "greater than

26  occasional" but which may be "less than constant."  29 C.F.R. § 541.701.  This includes "work

27  normally and recurrently performed every workweek," but does not embrace "isolated or one-time

28  tasks." *Id.*

DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO PLAINTIFF HORAN-WALKER

1    Federal courts and the DOL have made clear that the rule does not imply a "majority of the

2    time" test. *Taylor*, 2012 WL 10669, at *3; *Wolfram v. PHH Corp.*, No. 12-CV-599, 2014 WL

3    2737990, at *7 (S.D. Ohio June 17, 2014) ("There is no suggestion in the regulations that work

4    performed customarily or regularly must occupy any given percentage of an employee's weekly

5    working hours."). Instead, the DOL has confirmed that "selling or sales related activity outside

6    the office 'one or two hours a day, one or two times a week'" is sufficient. *Taylor*, 2012 WL

7    10669, at *3 (quoting Opinion Letter Fair Labor Standards Act, 2007 WL 506575, at *3-4).

8    Here, Plaintiff testified that on average, she spent approximately two to three hours per

9    week outside of the office meeting with clients and prospective clients to make and keep business

10   in order to "generate sales." (Horan-Walker Dep. 183:1-14.) Plaintiff further testified that she has

11   clients throughout California as well as up to ten clients in states as far away as Washington,

12   Tennessee, Arizona and Nevada, and that she generally meets with these clients once per year.

13   (*Id.* at 66:3-67:9.) Her other outside undertakings include "visiting clients in Pacific Grove [and]

14   other places" (*id.* at 182:6-11)[5], meeting clients and prospective clients for meals, attending

15   seminars, and traveling to and from these client and prospective client meetings. (*Id.* at 181:6-

16   183:7.)

17   Plaintiff may argue that the exemption is inapplicable because there is no evidence that she

18   made a single "sale" to a client at his or her home or place of business. This narrow interpretation

19   of the exemption has been rejected by courts. *See Taylor*, 2012 WL 10669, at *4 ("Because

20   [plaintiffs] conducted substantial incidental work and solicitations outside of the office, it does not

21   matter that the actual moment of sale occurred inside the [defendant's] office."); *Hartman v.*

22   *Prospect Mortg., LLC*, 11 F. Supp. 3d 597, 604 (E.D. Va. 2014). The regulations simply do not

23   limit application of the outside sales exemption to those employees that consummate transactions

24   at a client's home or place of business. *See* Opinion Letter Fair Labor Standards Act (FLSA),

25   2006 WL 1094597, at *3 (Mar. 31, 2006) ("[W]hether 'sales force' loan officers are 'customarily

26   _____

27   [5]  Indeed, Plaintiff testified that that she has clients all through the state of California (*id.* at
     67:10-12) and that she prefers to meet with her clients in person (*id.* at 111:15-112:1, 184:3-8,

28   181:6-9).

-22-

and regularly engaged away from the employer's place of business' depends on the extent to which they engage in sales or solicitations, *or related activities*, outside of the employer's place or places of business" (emphasis added)).

It is undisputed that Plaintiff Horan-Walker frequently and consistently spent two to three hours outside of the office conducting what she has deemed sales activities.  As such, even if she could somehow circumvent the administrative exemption (which she cannot), her claim still fails under the alternative outside sales exemption analysis.

### C.   Plaintiff Cannot Delay Resolution Under Rule 56(d) Because WFA's Motion Is Based Entirely On Plaintiff's Own Admissions.

A defendant can seek summary judgment "at any time" prior to the close of discovery.  *See* Fed. R. Civ. P. 56(d).  Consistent with this, Rule 56(d) does not allow a party to avoid summary judgment simply because the discovery deadline has not passed.  Instead, a plaintiff seeking such delay must establish that she "cannot present facts essential to justify [her] opposition."  *See* Fed. R. Civ. P. 56(d).  To do this, a plaintiff must show, *inter alia*, a likelihood that evidence creating a material fact exists as well as an explanation as to how those facts will defeat the pending summary judgment.  *See, e.g.*, *Tatum v. City and Cnty. of San Francisco*, 441 F.3d 1090, 1100 (9th Cir. 2006) (affirming the denial of such a request because the plaintiff did not "identify the specific facts that further discovery would have revealed or explain why those facts would have precluded summary judgment.").

Here, WFA does not base the pending motion on a supervisor declaration stating that Plaintiff performed the tasks listed in section 541.203(b) or that she had limited contact with her supervisors.  Instead, WFA bases the motion on Plaintiff's own testimony about her duties, and Plaintiff cannot avoid her own admissions on these points.

In *D'Este*, the plaintiff filed a misclassification claim, and the defendant brought a motion for summary judgment just four months after removing the case, arguing that the plaintiff's own deposition testimony concerning her duties and supervision rendered her alternatively exempt under the administrative and outside sales exemptions.  *D'Este*, 2007 WL 6913682, at *4-5.  The court granted the motion and rejected the plaintiff's Rule 56(d) request because the court's

-23-

1   decision was "based upon Plaintiff's own description during her deposition of her job duties and

2   the work she performed for Bayer." *D'Este*, 2007 WL 6913682, at *4 n.1 ("[T]he issue of

3   whether Plaintiff's job duties, as she describes them, fall within the [exemption] is a question of

4   law for the Court to decide.  Accordingly, the Court finds that additional discovery would not

5   assist Plaintiff in opposing Defendant's Motion."); *see also Barron v. Lee Enters., Inc.*, 183 F.

6   Supp. 2d 1077, 1087-88 (C.D. Ill. 2002) (granting summary judgment for the employer in an

7   FLSA matter and rejecting a Rule 56(d) (then Rule 56(f)) request because "Plaintiffs could not

8   challenge their own testimony that they delivered these newspapers on a daily basis," and were

9   therefore subject to the exemption at issue).

10         The same is true here.  Plaintiff has testified that (a) she performed all of the duties listed

11   in section 541.203(b), including those mandated by her regulatory obligations; (b) her primary

12   duties were working with clients one-on-one to discuss values, financial goals and timelines in

13   light of their risk tolerance and then identify solutions that meet their financial needs; and (c) she

14   consistently worked outside of the office during her entire tenure at WFA.  WFA bases this motion

15   on Plaintiff's own description of her duties, and there is no reason for delay.  Indeed, as set forth

16   above, federal courts have granted early summary judgment motion against other financial

17   advisors asserting similar claims, and in the process have mooted motions for conditional

18   certification.  *Hein*, 511 F. Supp. 2d at 575; *Taylor*, 2012 WL 10669, at *6.

19   **V.      CONCLUSION**

20         For the forgoing reasons, in addition to the reasons set forth in the memorandum of law

21   accompanying WFA's Motion for Partial Summary Judgment as to Plaintiff Vlad Tsyn, WFA

22   respectfully requests that the Court grant the instant motion for partial summary judgment in favor

23   of WFA on Plaintiff Horan-Walker's FLSA claims.

24   DATED:  December 24, 2015              MUNGER, TOLLES & OLSON LLP

25

26                                          By:      */s/ Malcolm A. Heinicke*
                                                 MALCOLM A. HEINICKE
27                                               Attorneys for Defendant WELLS FARGO
                                                 ADVISORS, LLC
28