United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

VLAD TSYN, et al.,

Plaintiffs,

v.

WELLS FARGO ADVISORS, LLC,

Defendant.

Case No. 14-cv-02552-LB

**ORDER GRANTING SUMMARY JUDGMENT & DENYING CERTIFICATION**

[Re: ECF Nos. 54, 70, 85]

## INTRODUCTION

This is an overtime-compensation suit under the federal Fair Labor Standards Act ("FLSA") and similar California laws. (ECF No. 29.)[1] Plaintiffs Vlad Tsyn and Catherine Horan-Walker have worked for defendant Wells Fargo Advisors as licensed financial advisors. They claim that Wells Fargo misclassified them as exempt from the FLSA's overtime-pay mandate and so failed to pay them requisite compensation. (*See generally id.*)

Three motions are before the court. The plaintiffs move the court to conditionally certify a collective action on their FLSA claim. (ECF Nos. 41, 54.) Defendant Wells Fargo, in two separate

[1] Record citations refer to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the tops of documents.

United States District Court
Northern District of California

motions (one directed to each plaintiff), asks the court to grant summary judgment against that claim. (ECF Nos. 70, 85.) The court held a hearing on January 28, 2016.

The facts are undisputed. The parties disagree only over how to characterize those facts. In short, Wells Fargo contends that the most important aspects of the plaintiffs' jobs were collecting and analyzing customer information, assessing which financial products and services would best suit a client's needs, and giving clients appropriate advice. Wells Fargo argues that this exempts the plaintiffs from the FLSA's overtime-pay mandate as a matter of law. The plaintiffs do not deny that they performed these duties. They view this work as being secondary to "selling financial products," however, and argue that, because their "primary duty" was sales, they had to be paid added compensation for overtime work.

The plaintiffs' factual description of their work leaves no genuine issue for trial. Their primary duties were those things that governing regulations say will bring a financial-services employee within the FLSA's administrative exemption. Their primary duty was not selling financial products. The court therefore grants the defendant's motions for partial summary judgment and denies as moot the plaintiffs' motion to certify an FLSA collective action.

## GOVERNING LAW

### 1. The FLSA's Administrative Exemption

The FLSA requires employers to pay premium overtime compensation to employees who work more than 40 hours per week. 29 U.S.C. § 207(a)(1). The FLSA does not cover all employees, however, and those that fall outside its overtime requirement are said to be "exempt" from the statute. Wells Fargo claims that plaintiffs Tsyn and Horan-Walker were "employed in a bona fide . . . administrative capacity" and so fell outside the FLSA. *See* 29 U.S.C. § 213(a)(1). Exemptions from the FLSA are "narrowly construed." *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392 (1960); *Gieg v. DRR, Inc.,* 407 F.3d 1038, 1045 (9th Cir. 2005). Employees are presumed to be covered by the FLSA and entitled to overtime pay unless they "plainly and unmistakably" fit within an exemption. *Arnold*, 361 U.S. at 392. It is Wells Fargo's burden to prove that the plaintiffs were exempt. *E.g., id.*; *Gieg,* 407 F.3d at 1045.

The U.S. Department of Labor ("DOL") has "broad authority" to "define[] and delimit[]" the scope of this administrative exemption. *See* 29 U.S.C. § 213(a)(1); *In re Farmers Ins. Exchange, Claims Reps. Overtime Pay Litig.*, 481 F.3d 1119, 1127 (9th Cir. 2006). Under the governing regulations, broadly speaking, an employee falls within the administrative exemption if she is 1) paid a salary of at least $455 per week, and her "primary duty" 2) "is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers," and 3) "includes the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200(a).

The regulations define "primary duty" as

> the principal, main, major or ***most important*** duty that the employee performs. Determination of an employee's primary duty must be based on all the facts in a particular case, ***with the major emphasis on the character of the employee's job as a whole***. Factors to consider . . . include, but are not limited to, the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee.

29 C.F.R. § 541.700(a) (emphases added).

The regulations also give "examples" of employees who normally meet the administrative exemption. 29 C.F.R. § 541.203. The following example is of central importance to this case:

> Employees in the financial services industry generally meet the duties requirements for the administrative exemption if their duties include work such as collecting and analyzing information regarding the customer's income, assets, investments or debts; determining which financial products best meet the customer's needs and financial circumstances; advising the customer regarding the advantages and disadvantages of different financial products; and marketing, servicing or promoting the employer's financial products. However, an employee whose primary duty is selling financial products does not qualify for the administrative exemption.

29 C.F.R. § 541.203(b).

When the DOL issued this regulation in 2004, it confirmed that employees who primarily engage in these exempt tasks satisfy both prongs of the administrative exemption's duty requirement: that is, they both perform work "directly related to . . . management or general business operations" and exercise "discretion and independent judgment" on "matters of significance." *Defining and Delimiting the Exemption for Executive, Administrative, Professional,*

*Outside Sales and Computer Employees,* 69 Fed. Reg. 21,122, 22,146 (Apr. 23, 2004). The DOL also explained that "many financial services employees qualify as exempt administrative employees, *even if they are involved in some selling* to consumers." *Id.* (emphasis added).

Section 541.203(b) is consistent with decades of regulatory practice. The DOL's regulations have long treated "customers' brokers" (who are now called "registered representatives") as satisfying both heads of the administrative exemption's duties test. *See, e.g.,* 29 C.F.R. § 541.205(c)(5) (1949) ("customers' brokers in stock exchange firms" perform "work directly related to the management policies or general business operations" of the employer); 29 C.F.R. § 541.207(d)(2) (1973) (exemption covers "the kind of discretion and independent judgment exercised by a customer's man in a brokerage house in deciding what recommendations to make to a customer for the purchase of securities"); *see also Farmers*, 481 F.3d at 1128 (factoring in historical consistency of 2004 regulations).

The DOL confirmed the effect of § 541.203(b) in a 2006 opinion letter. The DOL there concluded that licensed financial professionals, who mainly perform the duties listed in the first part of § 541.203(b), satisfy both duty prongs of the administrative exemption — even if "[a]s an incident to providing their clients investment advice, registered representatives *also bring about the purchase or sale* of such investments for their clients and *execute the actual transactions* that result from their financial advice . . . ." Dept. of Labor, Wage & Hour Div. Op. FLSA2006-43, 2006 WL 3832994, *2 (Nov. 27, 2006) (hereinafter "2006 Op. Ltr.") (emphases added).

Courts "must give deference to the DOL's interpretation of its own regulations through, for example, Opinion Letters." *Farmers*, 481 F.3d at 1129 (citing *Webster v. Pub. Sch. Employees of Wash.,* 247 F.3d 910 (9th Cir. 2001) and *Auer v. Robbins,* 519 U.S. 452 (1997)). This is particularly true where the DOL's position "has been consistent over the years." *See Farmers*, 481 F.3d at 1129. The 2006 Opinion Letter, in particular, is through in reasoning through the applicable regulations, exhibits valid logic, and is consistent with historical regulatory guidance in this area. Its "power to persuade," and the deference this court must show it, are therefore "considerable." *See Voss v. C.I.R.*, 796 F.3d 1051, 1066 (9th Cir. 2015) (reasoning, validity, consistency (citing *Christopher v. SmithKline Beecham Corp.,* 132 S.Ct. 2156, 2168–69, 183 L.Ed.2d 153 (2012)));

*Bassiri v. Xerox Corp.*, 463 F.3d 927, 931-33 (9th Cir. 2006) ("[C]ourts grant an agency's interpretation of its own regulations considerable legal leeway." (quoting *Barnhart v. Walton,* 535 U.S. 212, 217 (2002))) (discussing *Christensen v. Harris County,* 529 U.S. 576 (2000), and *Auer, supra*).

**2. Summary-Judgment Law**

The court must grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). In judging evidence at the summary-judgment stage, the court does not make credibility determinations or weigh conflicting evidence, and draws all inferences in the light most favorable to the non-moving party. *E.g., Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587-88 (1986); *Ting v. United States,* 927 F.2d 1504, 1509 (9th Cir.1991). The evidence presented by the parties must be admissible. Fed. R. Civ. P. 56(e). Conclusory testimony is insufficient to raise genuine issues of fact and defeat summary judgment. *Thornhill Publ'g Co. v. GTE Corp.,* 594 F.2d 730, 738 (9th Cir. 1979); *accord, e.g., Whitlock v. Pepsi Americas*, 2009 WL 3415783, *2 (N.D. Cal. Oct. 21, 2009) *aff'd sub nom. Dalton v. Pepsi Americas*, 440 F. App'x 594 (9th Cir. 2011). In an FLSA suit, the duties that an employee performed is a question of fact. Whether those duties render the employee exempt from the FLSA's overtime-pay mandate is a question of law. *Farmers*, 481 F.3d at 1127 (citing *Bothell v. Phase Metrics, Inc.*, 299 F.3d 1120, 1124 (9th Cir. 2002)); *accord Icicle Seafoods, Inc.v. Worthington*, 475 U.S. 709, 714 (1986) ("The question of how the respondents spent their working time . . . is a question of fact. The question whether their particular activities excluded them from the overtime benefits of the FLSA is a question of law . . . governed by the pertinent regulations . . . .").

United States District Court
Northern District of California

## STATEMENT

### 1. The plaintiffs

The plaintiffs have both worked for Wells Fargo as licensed financial advisors. Mr. Tsyn worked in this role for Wells Fargo from 2008 to 2012; Ms. Horan-Walker has worked for Wells Fargo since 2009 and is still a Wells Fargo financial advisor.

There is no dispute that the plaintiffs were paid a guaranteed salary of more than $455 per week. (ECF No. 70 at 8; ECF No. 87 at 9 n. 1) (plaintiffs "do[] not dispute" the salary issue).

Both plaintiffs hold a Series 7 securities license. They both held this license for the entire time that they worked for Wells Fargo. (Tsyn Dep. – ECF No. 70-2 at 4-5, 10; Horan-Walker Dep. – ECF No. 85-2 at 28-29.) A Series 7 license is the basic qualification required to trade in securities. The license is issued upon successful examination by the Financial Industry Regulatory Authority ("FINRA"), a private self-regulatory body; FINRA is in turn regulated by the U.S. Securities and Exchange Commission. The Series 7 exam covers a variety of securities-related topics, including "economic theory and kinds of risk," "portfolio theory and analysis," "types of customer accounts," securities regulation, and ethics. *See* 2006 Op. Ltr. at *1; (ECF No. 70-2 at 13-14). Series 7 license holders are known as "registered representatives."

Both plaintiffs hold additional credentials. When he worked at Wells Fargo, Mr. Tsyn held Series 63 and 65 securities licenses and was a licensed insurance agent. (*Id.* at 4-5, 10.) Ms. Horan-Walker has an M.B.A. and holds a Series 66 securities license. (ECF No. 85-2 at 28-29.)

As registered representatives, the plaintiffs were subject to FINRA's rules. Two such rules are salient here, as they effectively dictated the sorts of work — the day-to-day tasks — that the plaintiffs did for Wells Fargo. The "Know Your Customer Rule" required the plaintiffs to "use reasonable diligence, in regard to the opening and maintenance of every account, to know (and retain) the essential facts concerning every customer and concerning the authority of each person acting on behalf of such customer." FINRA Rule 2090. Plaintiff Tsyn explains that this rule "means understanding the client's financial needs, their experience with investing, their basic knowledge, their financial net worth." (ECF No. 70-2 at 16.) The closely related "Suitability Rule" provides that licensed financial advisors

> must have a reasonable basis to believe that a recommended transaction or investment strategy involving a security or securities is suitable for the customer, based on the information obtained through the reasonable diligence of the [advisor] . . . to ascertain the customer's investment profile. A customer's investment profile includes, but is not limited to, the customer's age, other investments, financial situation and needs, tax status, investment objectives, investment experience, investment time horizon, liquidity needs, risk tolerance, and any other information the customer may disclose to the member or associated person in connection with such recommendation.

FINRA Rule 2111(a). Mr. Tsyn agreed that, under this rule, his "job as a financial consultant was to match an appropriate investment product to [his clients'] specific needs." (ECF No. 70-2 at 20; *see also id.* at 14-15, 19, 47, 50, 105.) Ms. Horan-Walker testified similarly. (ECF No. 85-2 at 44-45, 48-49.)

These rules seek to ensure that the licensed professionals who advise the investing public have understood a client's particular situation and recommend only investment activity that is appropriate for that client. (*See* Tsyn Dep. – ECF No. 70-2 at 14-17, 19, 22-23.) For convenience, the court calls these obligations FINRA's "suitability rules."

**2. The plaintiffs' duties**

Mr. Tsyn testified that his "primary task" was selling investment products. (ECF No. 70-2 at 18; *accord* Tsyn Decl. – ECF No. 79-11 at 2 [¶ 3].) "[E]verything he did as" a Wells Fargo financial advisor, he writes, "revolved around sales." (ECF No. 79 at 11-12) (citing Tsyn Dep. 101). He "was trained to make sales, he was paid based on his sales, and he was ranked, rewarded and disciplined based on the amount of his sales." (ECF No. 79 at 12). Similarly, Horan-Walker has said that her "primary duty at [Wells Fargo] is selling financial products." (Horan-Walker Decl. – ECF No. 87-2 at 3 [¶ 5].)

A Wells Fargo manager has called sales "critical" to the company. (ECF No. 79 at 13-14) (citing Curran Dep. – ECF No. 79-3 at 7-8). Ms. Horan-Walker's former manager, too, has stated that "sales is [the] primary and most important duty" for all Wells Fargo financial advisors. (Mosher Decl. – ECF No. 87-4 at 3 [¶ 8].).)

The plaintiffs' testimony shows that they did more than sell financial products. Mr. Tsyn described his work at Wells Fargo as "wealth management" and "managing portfolios." (ECF No.

70-2 at 18, 42.) This mainly entailed "[u]nderstanding [his clients'] financial needs, offering them appropriate financial solutions, and updating those financial solutions as their needs evolve." (*Id.* at 42-43.) After first obtaining a client, he would "gather [their] financial records" and "discuss [these] with them." (*Id.* at 39, 55-56.) He would then develop an appropriate strategy, comparing and evaluating investment products that might meet their needs. (*Id.* at 27, 56-57.) He would then "recommend products that seemed most suitable." (*Id.* at 57.) The client would be "offered an array of investments that might meet a need." (*Id.* at 57-58.) He would then discuss with his client "the benefits and features along with the risks" of the various products. (*Id.* at 29, 58.) He monitored clients' files over time, updating his assessments, and making further recommendations. (*Id.* at 48, 58-60.) He agreed that his advice was not standardized but reflected the analyses that he generated for, and tailored to, specific clients. (*Id.* at 35.)

Mr. Tsyn obtained all his clients through internal Wells Fargo referrals; he never had to "cold call" for clients. (*See id.* at 37.) He never had an on-site supervisor. (*Id.* at 35-36, 74.) He spoke with his supervisor weekly and met him in person once per month. (*Id.* at 73-74.) These meetings were about expanding Mr. Tsyn's business; they did not entail instructions about Mr. Tsyn's investment advice. (*Id.* at 83-84.) He did not send his supervisor the information he gathered on his clients; he did not need approval to contact clients, explaining that he "would just pick up the phone and do my job"; and he does not know whether any supervisor ever reviewed a wealth-management plan that he designed for his clients. (*Id.* at 75, 77-79.) There were a "handful of times" when management contacted him because his investment recommendations fell outside a particular liquidity rule. (*Id.* at 79-81.)

Ms. Horan-Walker testified to doing the same work. She gathers and analyzes her clients' financial information, assesses their needs (including their "values," "goals," and "risk tolerance"), evaluates available investment products to meet those needs, and then makes suitable recommendations to her clients, advising them of the advantages and disadvantages of different options. (*See* ECF No. 85-2 at 44-45, 48-49, 53-54, 63, 69-71, 94-97.) She also works to attract new clients by marketing and promoting the services that she can provide through Wells Fargo. (*Id.* at 72.) Ms. Horan-Walker agreed that, because her most important job is making

recommendations that best serve her clients, she would forgo a transaction rather than recommend something that was not in her client's best interests. (*Id*. at 53-54, 63.)

**3. Quantifying the plaintiffs' duties**

The plaintiffs' work can be roughly quantified. *See* § 541.700(a). Mr. Tsyn testified that he spent his time approximately as follows:

- 40% marketing and promoting his services, (ECF No. 70-2 at 44);
- 20% designing investment plans, (*id*. at 43);
- 20% meeting with clients, (*id*. at 45);
- Less than 5% staying current on economic events, (*id*.);
- 10% completing required paperwork to implement investment transactions to which his clients agreed, (*id*. at 44); and,
- 5% data input, using investment-evaluation software, and preparing for client meetings. (*Id*. at 45.)

Mr. Tsyn had a "dedicated assistant" (who presumably helped with the more administrative aspects of his work). (*See id.* at 89.)

Ms. Horan-Walker testified that her time is spent approximately as follows:

- 40% meeting with clients to build their financial profiles, make recommendations, advise them on the benefits and features of investment options (ECF No. 85-2 at 85-86);
- 20% on investment research (*Id.* at 60, 81);
- 15% preparing investment plans (*Id.* at 82);
- 10% promoting her services to build her client base (*Id.* at 83-84); and
- 15% on phone calls, opening accounts, placing orders and completing the paperwork associated with client transactions (*Id.* at 86-87).

At times, Ms. Horan-Walker too has had an assistant to whom she delegated certain tasks, which allowed her to spend more time advising her clients. (*Id.* at 26-27.)

**ANALYSIS**

There is no factual dispute about what the plaintiffs did. The plaintiffs testified that they did the work that § 541.203(b) says "generally" brings financial professionals within the administrative exemption. The parties disagree over how to characterize that work. More specifically, they disagree over what constituted the plaintiffs' "primary duty." Wells Fargo argues that the plaintiffs were primarily engaged in collecting and analyzing client information, assessing clients' financial needs, and recommending suitable financial products to clients — *i.e.,* in those things that § 541.203(b) says will warrant exemption. The plaintiffs respond that, although they did these things, their primary duty was "selling financial products." They argue that they thus fit within the last sentence of § 514.203(b), fell outside the administrative exemption, and were entitled to premium overtime pay.

**1. Core analysis: The plaintiffs mainly performed exempt work**

The plaintiffs' testimony shows that they did "virtually all of the very things that § 541.203 contemplates." *Farmers*, 481 F.3d at 1124. They collected and analyzed clients' financial information, assessed their particular needs, developed investment plans, advised clients about the benefits and drawbacks of different investments, and made suitable investment recommendations. They also marketed and promoted their services. Both plaintiffs testified that they spent approximately 85% of their time in these exempt duties. (*See* Tsyn Dep. – ECF No. 70-2 at 43-45; Horan-Walker Dep. – ECF No. 85-2 at 60, 81-87.) Two authoritative decisions — the Ninth Circuit's decision in *Farmers, supra*, and the DOL's 2006 Opinion Letter — compel the conclusion that the plaintiffs are therefore exempt from the FLSA's overtime-pay mandate.

**1.2 *Farmers***

The Ninth Circuit's decision in *Farmers, supra*, is highly analogous to this case. In *Farmers*, the Ninth Circuit held that insurance-claims adjusters qualified for the FLSA's administrative exemption. The appellate court thus reversed a bench-trial judgment in favor of the plaintiff

employees and directed judgment for the defendant employer. *Farmers*, 481 F.3d at 1128-29, 1134.

The dispute in *Farmers* is almost identical to that presented here. The *Farmers* plaintiffs were claims adjusters who sued their employer for allegedly misclassifying them as exempt from the FLSA's overtime-pay mandate under the administrative exemption. *Id.* at 1124, 1126. The district court agreed with the plaintiffs and, after a bench trial, entered judgment in their favor. *Id.* at 1124-27.[2]

On appeal, the Ninth Circuit started its central analysis by pointing to 29 C.F.R. § 203. *Farmers*, 481 F.3d at 1127-28. This is the same regulation discussed earlier in this order, the one that the DOL issued in 2004, and that sets out examples of employees who normally qualify for the administrative exemption. Quoting § 541.203(a), in particular, the *Farmers* court wrote:

> Insurance claims adjusters generally meet the duties requirements for the administrative exemption . . . if their duties include activities such as interviewing insureds, witnesses and physicians; inspecting property damage; reviewing factual information to prepare damage estimates; evaluating and making recommendations regarding coverage of claims; determining liability and total value of a claim; negotiating settlements; and making recommendations regarding litigation.

*Farmers*, 481 F.3d at 1127-28. The Ninth Circuit observed that this section did "not represent a change in the law" but was "consistent" with DOL regulations dating back to 1940. *Id.* at 1128. "Essential to the DOL's" exemption of claims adjusters, *Farmers* noted, was the fact that adjusters "us[e] their own judgment about what the facts show, who is liable, what a claim is worth, and how to handle the negotiations with either a policyholder or a third-party." *Id.* (quoting DOL Wage & Hour Div. Op. Ltr. 2 (Nov. 19, 2002)).

The Ninth Circuit then pointed to the decisive facts. The district court had found that, in their jobs, the plaintiffs had (among other things) determined whether a given policy covered a loss, interviewed insureds and "assess[ed]" their credibility, advised their employer "regarding any fraud indicators or the potential for subrogation and underwriting risk," sought additional

[2] Strictly speaking, the district court in *Farmers* held that some of the "nearly 2,000" plaintiffs were exempt, while others were not. *Farmers*, 481 F.3d at 1124. The Ninth Circuit held that *all* the plaintiffs were exempt. *Id.* The court notes this only for the sake of accuracy; the point is not material to this discussion.

settlement authority from their supervisors, when the settlement amount that they recommended "exceed[ed] their established authority," and "recommended a reserve upon estimating [their employer's] exposure on the claim, in accordance with state law requirements." *Farmers*, 481 F.3d at 1129.

"As far as we are concerned," the Ninth Circuit concluded, "that says it all." *Id.* "The district court's findings almost track word for word the language in § 541.203, and thus establish that [the] claims adjusters are exempt from the FLSA." *Id.* The Ninth Circuit rejected arguments — akin to those that the plaintiffs make here — that the claims adjusters did not exercise sufficient "discretion and independent judgment" because they were supervised and used computer software to help estimate claims. *Id.* at 1130-31. The court compared the latter to "consult[ing] . . . manuals and guidelines." *Id.* (citing *Cheatham v. Allstate Ins. Co.*, 465 F.3d 578, 585 (5th Cir. 2006) (per curiam)). The court reversed the judgment in the plaintiffs' favor and directed the district court to enter judgment for the employer. *Id.* at 1134.

The parallels to this case are obvious. Here, too, the plaintiffs testified that they performed "virtually all" those duties that § 541.203(b) says will generally bring a financial-services employee within the administrative exemption. They collected client information, analyzed that information and evaluated it in view of a given's client's investment profile, and on this basis gave their clients appropriate advice — which might, but need not, include recommendations that yielded a sale. Their testimony in this respect "almost track[s] word for word the language in § 541.203[(b)]." According to *Farmers*, "that says it all." *Farmers*, 481 F.3d at 1129. This court finds no important factual distinction between this case and *Farmers.* If the claims adjusters' work in *Farmers* meant that they qualified for the administrative exemption — that under 29 C.F.R. §§ 200 and 203 their primary work was both "directly related to . . . general business operations" and involved "the requisite discretion and independent judgment," *see Farmers*, 481 F.3d at 1129-31 — then the same must be said of the work that the licensed financial advisors did in this case.

One important difference separates this case from *Farmers*. The plaintiffs correctly write that *Farmers* did not face one question that is central to this case. Because it addressed a different part of 29 C.F.R. § 541.203, *Farmers* did not discuss, and so does not answer, whether the plaintiffs

had a "primary duty" of "selling financial products."[3] By contrast, this court must decide, not only whether the plaintiffs performed the work that "generally" brings financial-service employees within the administrative exemption (it is undisputed that they did), but also whether, notwithstanding that work, their "primary duty" was "selling financial products," which, under the last sentence of § 541.203(b), would take them back out of the exemption. Given the plaintiffs' own description of their work (if not the ultimate legal characterization they would give it), the court concludes that there is no genuine question that they were primarily engaged in exempt duties. They were not primarily "selling financial products." Apart from that one difference, *Farmers* is highly instructive. It overlaps this case to a significant extent and, to that extent, is of course controlling.

**1.2 The 2006 Opinion Letter**

The second decisive authority is the DOL's 2006 Opinion Letter. In that letter, as discussed above, the DOL concluded that Series 7-licensed "registered representatives," including "financial advisors" like Tsyn and Horan-Walker, who mainly perform the duties described in 29 C.F.R. § 541.203(b), "qualify for administrative exemption." 2006 WL 3832994 at 1-2.

The DOL specifically considered financial-services employees who, "to perform their primary duty of providing investment advice,

> collect . . . the clients' financial information . . . , analyze the information, compare and evaluate possible investment options, and identify investment strategies and potential investments based on their knowledge of market conditions and the clients' particular circumstances. They advise their clients on the advantages and disadvantages of various investment opportunities. In order to do this, they must keep apprised of the numerous and varied financial and investment vehicles in the market and the tax and securities consequences to the client of particular investments.

*Id.* at 2. Based on this underlying work, these employees "recommend[] to the client only those securities that are suitable for the client's particular financial status, objectives, risk tolerance, tax exposure, and other investment needs." *Id.* at 5. The opinion letter effectively assumed —

[3] Subsection (a) of 29 C.F.R § 541.203, which applied to the claims adjusters in *Farmers*, does not have the same exception concerning sales as a primary duty as does subsection (b), which governs the financial advisors here. *Compare* 29 C.F.R. § 541.203(a) *with* 29 C.F.R. § 541.203(b).

accepting the representation made by the party requesting the opinion — that "making sales [was] not their primary duty." *See id.* at 2, 5.

The DOL concluded that such employees were exempt, even though, "[a]s an incident to providing their clients investment advice, registered representatives *also bring about the purchase or sale* of such investments for their clients and *execute the actual transactions* that result from their financial advice . . . ." *Id.* at 2 (emphases added). More fully, the DOL concluded that such employees satisfy both heads of the administrative exemption's duties test: Their work is "directly related to the management or general business operations of the employer," and they "exercise . . . discretion and independent judgment with respect to matters of significance." *Id.* at 5 (citing 29 C.F.R. §§ 541.200(a)(2)-(3) and 541.203(b)). With respect to the latter element, the DOL elaborated:

> In general, the exercise of discretion and independent judgment involves comparing and evaluating possible courses of conduct and acting or making a decision after the various possibilities have been considered. *See* 29 C.F.R. § 541.202(a); *Farmers*[, 481 F.3d at 1124]. . . .
>
> The duties of the registered representatives you describe include ***evaluating*** the client's individual financial circumstances and investment needs and ***assessing*** and comparing the alternatives before making ***recommendations*** for investment options to the client, ***which satisfies this element of the administrative exemption***.

2006 Op. Ltr., 2006 WL 3832994 at 5 (footnote omitted) (emphases added). Because the regulatory test had remained consistent over time, the DOL could explain that its opinion would be "essentially identical" under older versions of the regulations, so that the employees described in the letter would "satisfy the requirements of the administrative exemption under both the pre-2004 and current regulations." *Id.* at 7.

The resonance with this case is plain. There is no dispute that plaintiffs Tsyn and Horan-Walker did "virtually all of the very things that [the 2006 Opinion Letter] contemplates." *See Farmers*, 481 F.3d at 1124. Nor can their "primary duty" be called "selling financial products." Their work instead fits the pattern depicted in the 2006 Opinion Letter: one where analysis, judgment, and advice predominate, and where attendant sales are relatively "incidental." The 2006 Opinion Letter confirms that plaintiffs Tsyn and Horan-Walker satisfy the duties requirements for

the administrative exemption. And this court must give that letter "considerable" deference. *See Bassiri*, 463 F.3d at 930-33.

The plaintiffs find this letter unpersuasive. They correctly point out that, in rendering its opinion, the DOL accepted the representation that the primary duty of the employees under consideration was not "making sales." (*See* ECF No. 79 at 9, 20-21.) That is the pivotal contested question in this case, so, in the plaintiffs' view, the 2006 Opinion Letter is "inapposite." (*Id.* at 20.)

The court understands the plaintiffs' point. It is true that the 2006 Opinion Letter effectively assumed, what is disputed here, that the employees did not primarily "sell[] financial products." The "primary duty" characterization was assumed in the Opinion Letter in a way that it cannot be here. Here, it is Wells Fargo's burden to *prove* that exempt work was primary. Wells Fargo has made that showing. Again, the plaintiffs' own testimony shows, beyond genuine dispute, that their principal work was the analysis, judgment, and advice that they provided their clients. Quantitatively, both plaintiffs describe spending roughly 85% of their time in exempt duties. Qualitatively, both recognized that generating suitable advice for particular clients was their core work: so much so that Ms. Horan-Walker would forgo sales transactions if that did not serve her client's best interests. Selling — though not unimportant — was "incidental" to that primary work. If the plaintiffs did their jobs correctly, in fact, followed FINRA's suitability rules, and recommended only what was suitable to their clients, then in many cases they must have advised *against* a sale. Or at least declined to recommend a sale. Proper advice was the leading concern. Their primary duty was not "selling financial products." With that showing made, the 2006 Opinion Letter attains "considerable" persuasive force. *See Bassiri,* 463 F.3d at 930-33.[4]

---

[4] The court does not think, or mean to say, that FINRA's suitability rules alone dictate that licensed financial-services employees will have "primarily" engaged in exempt work in every case. One can conceive of a licensed financial advisor whose day-to-day work and discretion were so drastically limited that they became essentially salespeople, or elaborate cashiers. The last sentence of § 541.203(b) seems to contemplate just that case. But that is not this case. Those are not the present (undisputed) facts.

**1.3 *Hein v. PNC Financial Services Group***

The decision in *Hein v. PNC Fin. Svcs. Grp., Inc.*, 511 F. Supp. 2d 563 (E.D. Pa. 2007), holding a financial professional exempt as a matter of law, is also persuasive. The plaintiff in *Hein* was a licensed "securities broker." *Hein*, 511 F. Supp. 2d at 565-66. He claimed that his former employer had misclassified him under the FLSA's administrative exemption. *See id.* at 567-71. In *Hein,* as in this case, "the parties [did] not dispute[] [the] Plaintiff's actual duties, only the characterization of those duties." *Id.* at 572. Like the plaintiffs here, Hein "maintain[ed] that his primary duty was selling." *Id.* Sales indeed played a large role in Hein's work — at least as significant a role as it played in Tysn's and Horan-Walker's. "Mr. Hein sold myriad financial instruments." *Id.* at 566. All were "sophisticated investment instruments" from an "approved list provided by" his employer. *Id.* at 566-67. He spent approximately half his time "cold calling" potential clients and "was paid a commission on his sales." *Id.* at 566, 573. "His compensation depended largely on his clients' actual sales or purchases." *Id.* at 569.

The *Hein* court nevertheless found it "plain" and "unmistakabl[e]" that this broker was "exempt from the FLSA's overtime pay requirements." *Id.* at 569, 575. The court thus granted summary judgment for the employer (which mooted the plaintiff's motion to certify a collective suit). The *Hein* court gave several reasons for its decision. Each applies here, as does the *Hein* court's overall understanding and application of the exemption.

First, the evidence suggested that Hein's "most important" role was to give his clients suitable advice. *See id.* at 568-69. The *Hein* court summed up the "overall nature" of his work:

> Mr. Hein testified that although both he and PNC [his employer] profited from his sales, and regarded high sales volume as important and desirable, the most important thing he did was to advise the client on the best thing for the client.

*Id.* at 569. Here, FINRA regulations required both plaintiffs to ensure that they gave their clients suitable advice. *See* FINRA Rules 2090, 2111(a). Mr. Tsyn admitted that he followed this obligation and that his "primary role" at Wells Fargo was to "design and maintain comprehensive wealth plans to address estate, retirement income, and business succession needs." (ECF No. 70-2 at 62, 64; s*ee also id*. at 20 ("[M]y task was to understand my client, and my job as a financial consultant was to match an appropriate investment product to their specific needs."). Similarly,

Ms. Horan-Walker agreed that she would forgo a sale rather than recommend a course of action that was not in her client's best interests because the most important part of her job is making recommendations that best serve her clients. (ECF No. 85-2 at 53-54, 63.)

Second, the plaintiff in *Hein* was subject to "minimal" supervision. He saw his manager "no more than twice a month," he communicated with him by phone or email "no more than eight times a month," and his manager "did not observe [his] meeting with clients." *Hein*, 511 F. Supp. 2d at 567, 574. Here, Mr. Tsyn testified that he spoke with his manager by phone weekly and met with him only once a month. (ECF No. 70-2 at 73-74.) His manager did not sit in on his client meetings or generally review his investment advice. (*Id.* at 75, 78-79.)

Equally important, the *Hein* court rejected the notion that the plaintiff could escape summary judgment by labeling his various functions as non-exempt sales because they could lead to a transaction. *See Hein*, 511 F. Supp. 2d at 573. That argument, the court wrote, "mischaracterizes the undisputed evidence, and asks me to ignore or contravene" the "numerous DOL regulations to which I am required to defer." *Id.* Pointing to § 541.203(b), the *Hein* court explained that the DOL "has sought to exempt from the FLSA investment advisors in the financial[-]services industry — *including those engaged in 'sales'* — provided their sales activities *are a function of their professional judgment respecting their clients' best interests*." *Id*. at 570 (emphases added). Accordingly, the court found that even the plaintiff's cold-calling activities were exempt because he would use at least parts of these calls to gather information about "assets and investment goals." *Id.* at 573. The court held that any "cultivating and conveying sales activities are exempt," and it held that all the plaintiff's meetings with clients were exempt because most were "spent information-gathering and decision-making rather than implementing an actual sale or investment." *Id*. The court found that the plaintiff had spent only a small amount of time on the non-exempt task of "closing the sale," that is, "processing actual transactions [and] filling out paperwork." *Id.* at 573-74. The *Hein* court summarized its holding in usefully short compass:

> The Department of Labor regulations by which the FLSA is implemented draw a clear distinction between highly paid, highly trained investment advisors engaged in sophisticated sales work — who are not entitled to overtime pay under the FLSA — and lower[-]paid employees engaged in selling simple, basic products — who are. Construing the record facts most favorably to Plaintiff, it is apparent that under

> these regulations, he is not entitled to overtime pay. Accordingly, I grant summary judgment in Defendants' favor.

*Id.* at 565. The court also denied as moot the plaintiff's motion to certify an FLSA collective action. *Id.* at 575-76.

The same result must obtain here. The two cases differ in no significant way. If anything, "selling financial products" figured more prominently in the *Hein* plaintiff's work than it did in Mr. Tsyn's or Ms. Horan-Walker's. If summary judgment was appropriate in *Hein*, and this court agrees that it was, then it is all the more appropriate here. Maybe most basically, the plaintiffs' testimony shows that sales were "a function of their professional judgment respecting their clients' best interests." *See id.* at 570. Sales, if important, were subordinate. *See* 29 C.F.R. §541.700(a) ("primary duty" inquiry considers "the relative importance of the exempt duties as compared with other types of duties"). All the governing regulations dictate that, on these undisputed facts, selling does not render financial advisors like Mr. Tsyn and Ms. Horan-Walker non-exempt. *See also Bachrach v. Chase Inv. Servs. Corp.*, No. 06-2785, 2007 WL 3244186, at *1, *3 (D.N.J. Nov. 1, 2007) ("[T]he law strongly suggests that [financial advisors] were not entitled to overtime . . . .").

**2. The plaintiffs' work cannot all be reduced to sales**

**2.1 The plaintiffs' argument contravenes longstanding regulation**

The main engine of the plaintiffs' analysis is to characterize almost everything that they did as sales. There is no dispute that some, though not all, of the work that the plaintiffs did for Wells Fargo resulted in selling a financial product or service. There is no dispute that Wells Fargo tracked the plaintiffs' sales and considered them important. (*See* Curran Dep. – ECF No. 79-3 at 7-8; Mosher Decl. – ECF No. 87-4 at 3 [¶ 8].) But the plaintiffs' view is that *all* that they did was ultimately motivated by the desire to sell financial products, so that all their work — gathering and analyzing client information, assessing a client's needs, and making appropriate recommendations — was "incidental" to "selling financial products." (*E.g.,* ECF 79 at 17.) Sales was their "primary duty," the plaintiffs contend, so that they come within the final sentence of § 541.203(b) and land outside the administrative exemption.

The court cannot accept this argument for two broad reasons.

First, the plaintiffs' reductive characterization is at all levels inconsistent with longstanding regulation. It is inconsistent with *express* regulatory guidance. The DOL has said: "[M]any financial services employees qualify as exempt administrative employees, *even if they are involved in some selling to consumers*." 69 Fed. Reg. at 22,146. The DOL's 2006 Opinion Letter similarly concluded that licensed financial professionals who do exactly the sort of work that the plaintiffs describe having done for Wells Fargo — "collect[ing]" and "analyz[ing]" the "clients' financial information," "evaluat[ing] possible investment options," "advis[ing] their clients on the advantages and disadvantages of various" options, and so on — fall within the administrative exemption *even if* "[a]s an incident to providing their clients investment advice," they "also bring about the purchase or sale of . . . investments" and even if they "execute the actual transactions that result from their financial advice." 2006 Opinion Letter at *2.

The plaintiffs' position is also innately at odds with the structure and mandate of the regulations. Calling all that these plaintiffs undisputedly did "selling financial products" — thus placing it all within the last sentence of 29 C.F.R. § 541.203(b) — would erase most of the specific rules, explanations, and considerations that the rest of the controlling regulations (such as 29 C.F.R §§ 541.200(a)(3) and .700(a), or the DOL's 2006 Opinion Letter) tell us factor into the determination of whether given employees meet the administrative exemption. Consider § 541.203(b) itself. The bulk of that regulation explains that financial-service employees are generally exempt if they collect and analyze information, assess client needs, and give suitable advice. The plaintiffs undeniably did all that. They *mostly* did that. If we can nonetheless label all that work as merely sales, and invoke the last sentence of § 541.203(b) to pull such work back out of the administrative exemption, then what remains of the bulk of § 541.203(b) and its substantive directive? The same can be said with respect to all the other governing regulations. The plaintiffs would force everything into the last sentence of § 541.203(b), making that the predominant rule, and obviating all else that the law says matters. The correct view must instead be the one that *Hein* proffers, so that § 541.203(b)'s final sentence covers less "sophisticated" work, and those who

mainly do true, garden-variety selling, but who do not analyze, judge, and advise on financial matters.

Furthermore, on these facts, the plaintiffs' "primary duty was selling" argument clangs against FINRA's suitability rules. Those rules effectively make giving suitable advice the leading principle in licensed financial service. It is suitable advice — whether or not this involves a sale — that is the licensed financial professional's "primary duty," both in theory and, as the plaintiffs describe their work, in fact. In light of the suitability rules, we may frame this whole analysis another way: All the work that the plaintiffs did is not rightly categorized under the head, "selling financial products." All that work, including any selling, is more correctly categorized under "giving suitable advice." All else falls under that rubric.[5]

Last in this vein, reducing the analysis, judgment, and advice that the plaintiffs gave their clients to primarily "selling" — to merely (in the plaintiffs' words) "rank and file" "production" — contravenes the spirit of the regulations. Or, maybe better, it abrades their overall expression and application of the administrative exemption. Which may finally be why the plaintiffs' "primary duty" characterization seems a sharp departure from decades of regulatory guidance.

**2.2 Conclusory labels**

The second broad reason that the court cannot agree with the plaintiffs' "primary duty" argument involves the character of the evidence that supports it. In short, the plaintiffs cannot avoid summary judgment by citing their own deposition testimony in which they conclusorily labeled their work as "sales." That is not much different from alleging in a complaint that one is not exempt. It does not raise a genuine issue for trial. *See, e.g., Thornhill Publishing,* 594 F.2d at 738.

This can be unpacked. There are two senses in which given aspects of the plaintiffs' work might be deemed "primary." The first is the simply factual: In what tasks did the plaintiffs mostly occupy themselves? The purest expression of this factual mode lies in 29 C.F.R. § 541.700(a)'s

[5] Again, the court does not take FINRA's rules as themselves decisive. *See supra*, note 4.

admonition to consider "the amount of time spent performing exempt work," which is to say, in quantitative assessment. (Here, again, exempt duties absorbed roughly 85% of the plaintiffs' time.) The second sense in which work may be called "primary" is as a characterization — and here, more precisely, as a legal conclusion. This is the overall, fuller, qualitative assessment at which the exemption analysis finally aims. This mode is reflected in 29 C.F.R. § 541.700(a)'s direction to lay "the major [analytical] emphasis on the character of the employee's job as a whole." It is in this sense that the Supreme Court and Ninth Circuit call exemption a question of law. *See Icicle Seafoods*, 475 U.S. at 714; *Farmers*, 481 F.3d at 1127; *Bothell*, 299 F.3d at 1124.

It is at all lengths a characterization — not a fact — that the plaintiffs offer when they state that their "primary duty" was sales. (*See* Tsyn Dep. – ECF No. 79-6 at 7, 24; Horan-Walker Decl. – ECF No. 87-2 at 3 [¶ 5]; Horan-Walker Dep. – ECF No. 87-8 at 20 (all work is "somehow related" to sales).) It is legitimate for them to have given their assessment. And the court has weighed their testimony. But the plaintiffs' label does not itself raise a genuine issue for trial. It cannot supplant the fuller analysis of the undisputed facts that Rule 56 demands, or the legal conclusion that guiding authority draws from those facts.

**3. The plaintiffs exercised discretion and independent judgment**

The plaintiffs argue that several restrictions on their work meant that they did not exercise sufficient "discretion and independent judgment" on "matters of significance" to satisfy 29 C.F.R. § 541.200(a)(2)-(3). They point to the facts that they were supervised, could neither dictate nor deviate from corporate policy, and could recommend or sell only products that Wells Fargo had "pre-approved." (ECF No. 79 at 22-25.) None of these things suggests that the plaintiffs were so restricted in their discretion to fall outside the administrative exemption.

First, the DOL's 2006 Opinion Letter largely resolves this point. Again, that letter concluded that licensed financial advisors who primarily do the sorts of tasks described in 29 C.F.R. § 541.203(b), as both plaintiffs did — "collecting" and "analyzing" information, "evaluating" options, and ultimately "advis[ing]" their clients — by that very work "exercise . . . discretion and independent judgment with respect to matters of significance" sufficient to "satisf[y] this element

of the administrative exemption." 2006 Op. Ltr. at 2, 5-6. The regulatory letter addressed this aspect of the exemption specifically. *Id.* at 5-6. The DOL's issuing statement on the 2004 regulations reaches the same conclusion: Employees who primarily perform the exempt duties listed in 29 C.F.R. § 541.203(b) thereby satisfy both prongs of the duties analysis. *See* 69 Fed. Reg. at 22,146.

Turning to the plaintiffs' arguments more specifically, governing law shows that none suggests a viable issue for trial. For example, that the plaintiffs were supervised does not mean that they lacked adequate discretion. The governing regulations explain:

> [E]mployees can exercise discretion and independent judgment even if their decisions or recommendations are reviewed at a higher level. Thus, the term "discretion and independent judgment" does not require that the decisions made by an employee have a finality that goes with unlimited authority and a complete absence of review. . . . The fact that an employee's decision may be subject to review and that upon occasion the decisions are revised or reversed after review does not mean that the employee is not exercising discretion and independent judgment.

29 C.F.R. § 541.202(c). The securities broker found exempt in *Hein* worked under supervision roughly equivalent to Mr. Tsyn. *See Hein*, 511 F. Supp. 2d at 567. The *Hein* court called this supervision "minimal." *Id.* The claims adjusters that *Farmers* held exempt were more heavily supervised. *See Farmers*, 481 F.3d at 1130. Yet they were not "so closely supervised" that they did "not have the authority to make independent choices." *See Farmers*, 481 F.3d at 1130 (quoting 2006 Opinion Letter at 2, 6). The same is true of Mr. Tsyn.

Precedent also bars the court from concluding that the plaintiffs lacked independent judgment because they were subject to Wells Fargo's corporate policies, spelled out, as the plaintiffs note, in lengthy policy manuals. (*See* ECF No. 79 at 23); *Farmers*, 481 F.3d at 1131 (discussing effect of corporate policies on exempt status). The Ninth Circuit declared itself "unpersuaded" by such arguments in *Cheatham v. Allstate Ins. Co.*, 465 F.3d 578, 585-86 (9th Cir. 2006). The appellate court there affirmed a district court's holding that insurance-claims adjusters qualified for the administrative exemption. *Id.* "[T]hat Allstate adjusters must consult with manuals or guidelines does not preclude their exercise of discretion and independent judgment." *Id.* at 585 (cited in *Farmers*, 481 F.3d at 1130-31). It is hard to imagine that any company operating in so heavily regulated an industry as investments could proceed without laying out fairly significant policies

and guidelines for its personnel. Corporate oversight must to some extent be consistent with administrative exemption. *See* 29 C.F.R. § 202(c) ("[E]mployees can exercise discretion and independent judgment even if their decisions or recommendations are reviewed at a higher level."). As *Cheatham*, *Farmers*, and *Hein* imply. Certainly nothing in the governing regulations suggests that a financial-services employee must enjoy unlimited discretion or operate free of structured policy guidance. In fact, the regulations suggest just the opposite. *See* 29 C.F.R. § 541.202(c). Given the undisputed facts, and in light of controlling law, Wells Fargo's policies do not so impair the plaintiffs' "discretion and independent judgment" that they raise a genuine issue for trial.

The plaintiffs also point to the fact that they could recommend and sell only those products that Wells Fargo had "pre-approved." (ECF No. 79 at 25.) This does not raise a genuine issue that their discretion was so limited as to preclude the exemption. It is undisputed that the plaintiffs could recommend a "wide breadth" of investment options to their clients — maybe "thousands" — though Mr. Tsyn estimates that he only ever used 20 or 30. (*See* ECF No. 70-2 at 25, 76.) This "pre-approved" universe leaves room for all the work — the analysis, evaluation, and advice — that the plaintiffs undisputedly did, and which the governing regulations say satisfy the "discretion and independent judgment" head of the administrative exemption's duties test. The plaintiffs still gathered information on their clients, still had to understand their clients' particular situations, and still had to apply professional judgment in choosing products that suited them. Their work was no less professional, no less discretionary, because they could choose from a defined group of products. One can imagine a case in which a financial professional's choice is so sharply limited as to almost nullify her discretion and judgment. But, as the plaintiffs describe their work, that is not this case.[6]

Finally in this vein, the plaintiffs argue that they did not impact "matters of significance" because they did not "formulat[e] . . . corporate policies or business plans." (*See* ECF No. 79 at

---

[6] Unapproved products were not completely *verboten*. The plaintiffs could advocate for a previously unauthorized product if they thought it appropriate for a client. (*See* ECF No. 70-2 at 76.)

United States District Court
Northern District of California

19, 22-23.) This can be a relevant consideration. *See* 29 C.F.R. § 541.202(b). Nothing in the regulations, however, makes such executive-level work *necessary* to exercising "discretion and independent judgment." To the contrary. The workers that the 2006 Opinion Letter found exempt were not described as playing such a role. Yet they exercised "discretion and independent judgment" on "matters of significance." By implication, then, it must not be indispensable to this aspect of the administrative exemption to "formulate, affect, interpret, or implement" a company's "management policies," "business plans," or "operating practices." (*See* ECF No. 79 at 19, 23.) It is again useful to remember the structure of the regulations. Section 202 provides factors to consider in weighing the "discretion and judgment" prong. And section 203(b) provides examples of work that normally meets the whole exemption — including this prong. The 2006 Opinion Letter then confirmed that those who do this kind of work — even if they don't develop policy — nonetheless exercise adequate discretion and free judgment to satisfy the administrative exemption.

**4. The plaintiffs' proposed analogies**

The plaintiffs cite two FLSA-exemption decisions that (they contend) should prevent this court from granting Wells Fargo summary judgment. (ECF No. 87 at 9, 18.) In *Takacs v. A.G. Edwards and Sons, Inc.*, 444 F. Supp. 2d 1100 (S.D. Cal. 2006), and *In re RBC Dain Rauscher Overtime Litig.*, 703 F. Supp. 2d 910 (D. Minn. 2010), courts denied employers' motions for summary judgment because the plaintiffs had raised genuine issues on what constituted their "primary duty" for purposes of the FLSA's administrative exemption. (*See* ECF No. 79 at 8-9.) At the summary-judgment hearing, the plaintiffs emphasized the importance of *Takacs* and *RBC*. The court has reviewed both cases carefully. Neither suggests that Mr. Tsyn or Ms. Horan-Walker raises a triable issue on the undisputed facts of this case. Indeed, on the point on which it is closest to this case, *RBC* held that there was "no genuine dispute" about the plaintiffs' primary duty. *RBC,* 703 F. Supp. 2d at 939.

United States District Court
Northern District of California

**4.1 *Takacs v. A.G. Edwards and Sons***

The plaintiffs in *Takacs* were financial consultants. *Takacs*, 444 F. Supp. 2d at 1104. Denying the defendant's motion for summary judgment, the *Takacs* court held that the employer had not shown that the plaintiffs' "primary duties [fell] within the . . . administrative exemption under the FLSA." *Id.* at 1106-13.

*Takacs* is of little effective help. A significant factual distinction separates *Takacs* from this case. The work at issue in the two cases is simply different. The two plaintiffs in *Takacs* undisputedly spent most of their time cold-calling clients to sell financial products. "Plaintiff Takacs spent at least 75% of his time cold-calling prospective clients to sell bonds and other financial products"; the other plaintiff "spent more than 50% of his time prospecting for clients." *Takacs*, 444 F. Supp. 2d at 1112. The *Takacs* defendant did "not dispute that Plaintiffs spent more than 50% of their time 'cold-calling' or trying to obtain new clients for the purpose of selling its securities and other financial offerings." *Id.* The bulk of the *Takacs* plaintiffs' time was thus spent in quintessential "selling" activity. Mr. Tsyn and Ms. Horan-Walker, by contrast, spent most of their time in analysis, evaluation, and advice. If *Takacs* is useful here, it is by highlighting, in contrast to this case, the type of financial-service work that does primarily consist of "selling financial products."

The impact of *Takacs* is further reduced by two analytical distinctions. Both reflect the fact that *Takacs* applied older (pre-2004) regulations. First, *Takacs* applied neither 29 C.F.R. § 541.203(b) nor the DOL's 2006 Opinion Letter. These current authorities specifically address the financial-service work at issue here; they consider the kinds of tasks that licensed financial professionals do; and they conclude that, generally, such workers are exempt.

Second, *Takacs* threaded an operative part of its reasoning around the "administration–production dichotomy." *See Takacs*, 444 F. Supp. 2d at 1110-12.This test was used to "clarify the phrase 'work directly related to the management policies or general business operations' in the pre-2004 regulations." *RBC*, 703 F. Supp. 2d at 933. The administration–production framework appeared in former 29 C.F.R. § 541.205(a), which provided:

> The phrase "directly related to management policies or general business operations of his employer or his employer's customers" describes those types of activities relating to the administrative operations of a business as distinguished from "production" or, in a retail or service establishment, "sales" work.

*See, e.g., Bothell*, 299 F.3d at 1125-27 (discussing test). The instant plaintiffs invoke this schema to urge that they were "rank and file" workers at the "production" end of Wells Fargo's business. (*See* ECF No. 79 at 6, 9, 17-19.)

The DOL removed Section 541.205 from the regulations in 2004. *See* 69 Fed. Reg. at 22140-41; *RBC*, 703 F. Supp. 2d at 933-34. Something of the test survives in the last sentence of current 29 C.F.R. § 541.201(a). *See* 69 Fed. Reg. at 22,140-41. That sentence provides:

> To meet this requirement [of doing work directly related to management or general business operations], an employee must perform work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment.

29 C.F.R. § 541.201(a) Even here, though, the DOL has said that the correct current view of the dichotomy is the one that the Ninth Circuit took in *Bothell*: "[T]he 'production versus staff' dichotomy is 'one analytical tool' that should be used 'toward answering the ultimate question'" — whether employee's work is "directly related to . . . management policies or general business operations" — "and is only determinative if the work 'falls squarely on the production side of the line.'" 69 Fed. Reg. at 22141; *see Bothell*, 299 F.3d at 1126-27.

The court finds the administration–production framework of little help in this case. As the Seventh Circuit has observed, the test had "an industrial age genesis" and is "only useful by analogy in the modern service-industry context." *Roe-Midgett v. CC Servs., Inc.*, 512 F.3d 865, 872 (7th Cir. 2008). Discussing insurance-claims adjusters in *Roe-Midgett*, the Seventh Circuit wrote:

> The analogy is not terribly useful here, particularly given that the 2004 regulations suggest a more traditional meaning of "production." . . . [These claims adjusters] are obviously neither working on a manufacturing line nor "producing" anything in the literal sense. They are ***service providers***, and the service they provide is the administration of insurance claims.

*Roe-Midgett*, 512 F.3d at 872–73 (emphasis in *Roe-Midgett*). The *RBC* court, too, found the test "unhelpful." *RBC*, 703 F. Supp. 2d at 933-34. This court agrees: the administration–production

framework is mostly "unhelpful in assessing whether securities brokers . . . are engaged in work that is directly related to management or general business operations of the employer or its customers." *RBC*, 703 F. Supp. 2d at 933-34.

Given its different facts and analysis, *Takacs* does not suggest that the undisputed facts of this case raise a genuine issue for trial.

**4.2 *In re RBC***

The district court in *RBC* declined to enter summary judgment against five plaintiffs, who had been securities brokers, because they raised a genuine issue on whether they qualified for the FLSA's administrative exemption. *RBC*, 703 F. Supp. 2d at 913-14, 925-41. The decision in *RBC* does not suggest that Mr. Tsyn and Ms. Horan-Walker can withstand summary judgment on the undisputed facts of this case.

On the point on which *RBC* is closest to this case, in fact, it suggests that summary judgment *is* appropriate here. One plaintiff in *RBC,* a broker named David*,* presented facts closely similar to those presented here. His "own testimony" showed that

> his most important duty was to give advice and make recommendations to clients — duties that are exempt. *See Hein,* 511 F. Supp. 2d at 572 . . . . He testified that he spent most of his time engaged in this duty. He also testified that he worked independently and was free from supervision. Finally, there is no evidence to suggest that other employees received specific compensation for the part of David's work that was nonexempt: "[c]losing the sale." *See Hein,* 511 F. Supp. 2d at 573 (internal quotation marks omitted). All plaintiffs described the act of closing a sale as a relatively minor event that takes place in a matter of minutes.

*RBC*, 703 F. Supp. 2d at 938-39. The *RBC* court found that this testimony "flatly contradict[ed]" the plaintiffs' claim that David's "research, analysis and fact-gathering" was "subordinate to his primary duty of sales." *Id.* at 938. The court concluded: "Viewing these factors as a whole, and viewing the evidence in a light most favorable to David, *there is no genuine dispute that David's primary duty was to give advice and make recommendations* to clients." *Id.* at 939 (emphasis added).

To that important extent, *RBC* supports the decision that this court has reached: that, given Mr. Tsyn's and Ms. Horan-Walker's undisputed testimony about how they spent their time, and the

importance of making suitable recommendations to their clients, "there is no genuine dispute" that their primary duty was not "selling financial products."

The *RBC* court refused to find David exempt as a matter of law on other grounds. And it is here that this court must respectfully disagree with *RBC*'s analysis. Despite finding no "genuine dispute" that David's primary duties consisted of exempt work, the *RBC* court refused to enter summary judgment against his overtime claim because it found a genuine dispute as to whether his "primary duty" was "work directly related to [RBC's] management or general business operations." *Id.* at 939-40. Specifically, the *RBC* court reasoned that all David's clients "were individuals." *Id.* at 939. The court then wrote that "[i]ndividuals acting in a purely personal capacity do not have 'management or general business operations' within the meaning of [the administrative] exemption." *Id.* (citing Dept. of Labor, Wage & Hour Div., Administrator's Interpretation No. 2010-1 at 7 (Mar. 24, 2010)). Given the identity of David's clients, in other words, the court held that it could "[]not determine, as matter of law," whether David met the "management" or "business operations" head of the administrative exemption. *RBC*, 703 F. Supp. 2d at 939-40.

Earlier in its opinion, however, *RBC* recognized that the DOL's regulations "distinguish[] the exempt and nonexempt *financial services employees* based on the duties they perform, *not the identity of the customer they serve*." *Id.* at 930 (quoting 69 Fed. Reg. at 22146) (emphasis added). (The DOL's Interpretation 2010-1, on which *RBC* relied in this part of its analysis, applied to mortgage-loan officers, not licensed "registered representatives," and considered the identity of loan customers in that specific context.) The *RBC* court's ultimate denial of summary judgment on the basis of the identities of David's customers, their status as individuals, seems to contravene that rule.

In other respects *RBC* is factually different from this case. One *RBC* plaintiff, for example, worked mainly with "sophisticated" institutional investors who knew what they wanted to do with their money; these clients used the plaintiff's services to essentially place orders, "rather than to serve as an adviser and consultant making recommendations." *See id.* at 936-38. The *RBC* court held that there was a genuine issue on whether this plaintiff's "primary duty" was sales. *Id.* The

record in *RBC* was "unclear" as to how another plaintiff had spent 60% of his time; so, although he had agreed that investment planning was "at the heart of his job," which "strongly suggest[ed]" that his primary duty was analysis and advice, like David's, the gap in the record prevented the *RBC* court from summarily deciding his claim. *Id.* at 941. There is no similar uncertainty in this case about how Mr. Tsyn and Ms. Horan-Walker spent their time. Their testimony shows that it was mainly in work that the regulations deem exempt.

*RBC* does not suggest that, on the undisputed facts of this case, there is a genuine issue the plaintiffs' primary duty was "selling financial products."

**5. The court denies the plaintiffs' Rule 56(d) request for further discovery**

Finally, Ms. Horan-Walker asks the court — as an alternative to granting summary judgment — to postpone ruling on Wells Fargo's motion under Federal Rule of Civil Procedure 56(d) so that she may take further discovery to oppose that motion. (ECF No. 87 at 29-31.) The projected evidence would likely show that Wells Fargo's management considered sales important (*see id.*) — a point that Mr. Tsyn also made, and which this analysis has considered.

Rule 56(d) provides:

> If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition [to summary judgment], the court may:
>
> 1) defer considering the motion or deny it;
>
> 2) allow time to obtain affidavits or declarations or to take discovery; or
>
> 3) issue any other appropriate order.

Fed. R. Civ. P. 56(d).

There is already record evidence on this point. Ms. Horan-Walker submitted the declaration of her former Wells Fargo supervisor, who stated that "sales is [the] primary and most important duty" of Wells Fargo's financial advisors. (ECF No. 87-4 at 3 [¶ 8].) Ms. Horan-Walker has also submitted her own declaration and been deposed. Her testimony establishes that she performed those duties that the regulations say will qualify a financial advisor for the administrative exemption. Her testimony equally shows that her primary duty was not "selling financial

products." She cannot invoke Rule 56(d) in the hope of adducing evidence to contradict her own testimony that she mainly performed exempt work; at least, she cannot adduce such evidence to overcome summary judgment. *See Barron v. Lee Enters., Inc.*, 183 F. Supp. 2d 1077, 1087-88 (C.D. Ill. 2002) (granting defendant summary judgment in FLSA exemption case and denying Rule 56(d) — formerly Rule 56(f) — motion) ("Plaintiffs could not challenge their own testimony that they" performed duties sufficient to justify exemption); *D'Este v. Bayer Corp.*, 2007 WL 6913682 (C.D. Cal. Oct. 9, 2007) (denying Rule 56(f) motion where plaintiff's deposition testimony compelled summary judgment for defendant in overtime-exemption case); *United States ex rel. Army Athletic Ass'n v. Reliance Ins. Co.*, 799 F.2d 1382, 1387-88 (9th Cir. 1986) (affirming summary judgment and Rule 56(f) denial where projected further evidence could not have changed decisive finding). The court denies Ms. Horan-Walker's Rule 56(d) motion to suspend the summary-judgment motion pending further discovery.

## CONCLUSION

The plaintiffs' testimony establishes that they were mostly employed in tasks that governing regulations make exempt. The court therefore grants the defendants' motions for summary judgment and dismisses with prejudice the plaintiffs' second cause of action (ECF No. 29 [¶¶ 33-39]). The court denies as moot the plaintiffs' motion to conditionally certify an FLSA collective action. The court also denies the plaintiffs' request under Rule 56(d) for additional discovery.

This disposes of ECF Nos. 54, 70, and 85.

**IT IS SO ORDERED.**

Dated: February 16, 2016

LAUREL BEELER
United States Magistrate Judge